## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

ZAKAI ZEIGLER, )
)
    Plaintiff, )
) Case No.
v. )
) **JURY TRIAL DEMANDED**
NATIONAL COLLEGIATE )
ATHLETIC ASSOCIATION, )
)
    Defendant. )
)

## COMPLAINT

Comes now the Plaintiff, ZAKAI ZEIGLER, and for his Complaint would show as follows:

## INTRODUCTION

1.    Plaintiff Zakai Zeigler is an accomplished student and athlete who diligently completed his undergraduate degree in four years, all while excelling in his chosen sport of basketball. Now, he seeks to compete in the fifth year of his five-year eligibility window while pursuing a graduate degree. But he finds himself arbitrarily barred from doing so by an NCAA rule that limits athletes to participating in only four seasons of intercollegiate competition within the five-year window (the "Four-Seasons Rule"). As a result, he cannot compete or earn NIL compensation during his fifth year—the most lucrative year of the eligibility window for the vast majority of athletes.

2.    Many players, however, do compete in the fifth year of their eligibility window. And they can earn NIL compensation for all five of those years. Had Zeigler

been withheld from competing in sports during one of those four years, perhaps by redshirting, the NCAA rules would permit him to participate again next year. And this is true even if he would have slowed his academic progress and taken five years to graduate.

3.     Through the redshirt system, NCAA institutions—not athletes—largely control who gets access to the fifth year of eligibility, strategically "banking" eligibility for some athletes while denying it to others, without consideration, based purely on institutional preference and benefit. But, because Zeigler participated in athletics for four consecutive years, the NCAA bars him from representing his school in interscholastic competition in the fifth year of the competition window—and thereby excludes him from the market for NIL compensation.

4.     All NCAA athletes should be eligible to compete and earn NIL compensation during each year of the five-year window—not just those selected to redshirt. By prohibiting fifth-year competition for most athletes, including Zeigler, the NCAA eliminates the most experienced, productive, and highest-paid group of players from the labor pool, creating a substantial anticompetitive effect that furthers no academic purpose. And as a result, the market output—the product viewed by consumers—is harmed.

5.     This is no small matter. Without the Court's intervention, Zeigler faces an imminent and irreparable injury. In turn, he seeks preliminary injunctive relief to permit him to compete in the 2025-2026 basketball season while he pursues a graduate degree. Without such relief, Zeigler will lose irreplaceable opportunities for

athletic development, NIL compensation, and the chance to enhance his professional prospects—harms that cannot be adequately remedied by damages alone. Meanwhile, the NCAA will suffer no meaningful harm from allowing athletes to participate in all athletic seasons within the five-year eligibility window.

6.      The law and equities overwhelmingly favor Zeigler. He is substantially likely to succeed on his Sherman Act claim because the NCAA's Four-Seasons Rule constitutes an unreasonable restraint of trade with no legitimate procompetitive justification in the post-*Alston* landscape. The balance of hardships tilts decidedly in Zeigler's favor, and the public interest would be served by an injunction that aligns athletic eligibility with educational achievement rather than an arbitrary temporal limitation.

7.      The invalidity of the Four-Seasons Rule is particularly glaring given that the NCAA's own academic requirements implicitly recognize that the average NCAA athlete requires more than four years to graduate. The NCAA acknowledges this in at least three ways: (i) its Progress Toward Degree requirement that students complete just 20% of their credit hours each year; (ii) the redshirt rule allowing a five-year participation model, and (iii) the NCAA's celebrated six-year graduation rate metric. In the face of these facts, the NCAA itself has recently considered amending its bylaws to allow student-athletes to compete during all five years of the eligibility window, further undermining any claim that the current Four-Seasons Rule serves a procompetitive purpose. Further, since the COVID pandemic, NCAA athletes who began their careers in 2016, 2017, 2018, 2019, and 2020, have been allowed to

3

compete in all five years of their eligibility window. Zeigler's class is the first during the NIL era to have their ability to engage in commerce truncated to four years.

8. To be clear, Zeigler does not challenge the overall five-year window, but rather the arbitrary four-year competition limitation within it. Indeed, permitting NCAA athletes like Zeigler to compete while pursuing graduate degrees in their fifth year of eligibility would further the NCAA's purported academic mission far more effectively than other widely accepted NCAA practices like redshirting.

9. Zeigler files this lawsuit to seek relief so that the NCAA be enjoined from enforcing the Four-Seasons Rule against him and permitting him to compete during the 2025-2026 basketball season while pursuing a graduate degree.

<u>PARTIES</u>

10. Plaintiff ZAKAI ZEIGLER is a resident of Tennessee and, for the past four years, has been a student and athlete at the University of Tennessee. He completed his undergraduate degree in four years and wishes to pursue graduate education while continuing his basketball career for the last season in his five-year eligibility window.

11. Defendant NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("NCAA") is an unincorporated association of more than 1,000 colleges and universities that compete in intercollegiate athletics. The NCAA conducts business throughout the United States, including in the Eastern District of Tennessee. The NCAA has its principal place of business at and may be served with legal process at 700 West Washington Street, Indianapolis, Indiana 46206.

12. This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

13. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 26.

14. This action also arises under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101.

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

16. This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and because the NCAA transacts business and is found within this District. There are many NCAA Member Institutions located with the District.

## FACTUAL ALLEGATIONS

**A. The NCAA and Its Bylaws**

18. The NCAA is a membership organization comprised of over 1,000 colleges and universities that compete in intercollegiate athletics. Through its complex web of bylaws, the NCAA exercises plenary control over virtually every aspect of NCAA athlete eligibility.

5

19. Central to this case is the "Four-Seasons Rule," which limits student-athletes to four seasons of competition within a five-year period beginning when the athlete first enrolls in a collegiate institution.

20. NCAA Division I Bylaw 12.8 provides that "a student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" and further specifies that "a student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution."[1]

21. This rule applies uniformly to all NCAA athletes, regardless of whether they have successfully completed their undergraduate degrees within the traditional four-year timeframe.

**B. Plaintiff's Academic and Athletic Career**

22. Plaintiff Zakai Zeigler is an exemplar of the NCAA's stated educational mission. He successfully balanced the rigorous demands of Division I athletics with academic excellence, completing his undergraduate degree in four years—a rate that exceeds that of the general student population nationally.

23. Plaintiff Zeigler enrolled at the University of Tennessee in 2021 and has played four consecutive seasons of NCAA Division I men's basketball from the 2021-22 season through the 2024-25 season. During his time at the University of

---

[1] *See* Exhibit 1: NCAA Bylaw 12.8.

Tennessee, Zeigler has achieved remarkable success both academically and athletically.

24. Zeigler holds the record for most assists (747) and most steals (251) in Tennessee basketball team history. He was named the 2025 Defensive Player of the Year of the Southeastern Conference ("SEC") and was selected to the All-SEC First Team for the 2024-2025 season. He has been named to the SEC Academic Honor Roll on numerous occasions: 2021-22 Year, 2022-23 Winter, 2023-24 Winter, and 2024-25 Winter.

25. Despite suffering a season-ending ACL tear during his sophomore season, Zeigler demonstrated remarkable resilience, returning to play and maintaining his academic progress. He graduated from the University of Tennessee in May 2025 with a bachelor's degree in retail and merchandising management, completing his undergraduate education in four years while meeting or exceeding all academic requirements.

26. Zeigler contributed significantly to the University of Tennessee basketball program's success, including NCAA tournament Elite Eight appearances in 2024 and 2025, a Sweet Sixteen appearance in 2023, winning the SEC Tournament Championship in 2022, and capturing the SEC Regular Season Championship in 2024.

27. Zeigler has received substantial financial compensation through NIL agreements during his college basketball career. Zeigler earned approximately $150,000 in his first year (2021-22 season). His NIL compensation has grown each

year. In his fourth year (2024-25 season), he earned approximately $500,000 in NIL compensation.

28. Based on projections from Spyre Sports Group, the NIL collective associated with the University of Tennessee, Zeigler's NIL valuation for the 2025-26 season ranges from $2 million and $4 million. This valuation reflects the market value of an upperclassman with a proven performance record and high visibility, especially in a high-profile conference like the SEC.

29. Zeigler now wishes to pursue graduate education while continuing his athletic career for one additional season. He intends to enroll in a graduate program beginning in the fall of 2025. Absent relief from this Court, however, Zeigler will be precluded from athletic competition in the 2025-2026 season by operation of the NCAA's Four-Seasons Rule, despite his exemplary academic achievement.

30. Had Zeigler followed the NCAA's five-year track to graduation by "redshirting" (sitting out from competition) during their first year of eligibility, he would have been permitted to compete in his second through fifth years of eligibility, for a total of four years of competition. Under this route, his NCAA athletic scholarship would have covered five years of academic, residential, and other expenses. And he would have earned NIL compensation even during his redshirt year, meaning he would earn NIL compensation for each year of the five-year eligibility window.

31. But because he did not redshirt and instead played (and graduated) during his first four years on campus, the NCAA's Four-Seasons Rule will not allow

him to compete during his fifth year of eligibility. As a result, absent relief, he will not earn NIL compensation during the fifth year of his eligibility window.

32.     Similarly, had Zeigler enrolled at the University of Tennessee one year earlier, in 2020, he would have received a COVID-19 waiver, allowing him to compete all five years within his five-year eligibility window. But because he enrolled one year later, in 2021, he did not receive COVID-19 waivers, thus limiting him to only four years of competition.

### C. NIL Compensation and Post-*Alston* Changes

33.     The landscape of collegiate athletics has undergone a seismic shift following the Supreme Court's decision in NCAA v. *Alston* and the subsequent recognition of NCAA athletes' rights to compensation for their name, image, and likeness. What was once characterized as an amateur endeavor has evolved into a multi-billion-dollar commercial enterprise in which student-athletes can now receive substantial compensation through NIL deals.

34.     This transformation fundamentally alters the analysis of NCAA eligibility rules. NIL opportunities are directly tied to an athlete's eligibility to compete—when eligibility ends, so too does access to the lucrative market for NIL compensation.

35.     An NCAA athlete's eligibility to compete is the single most important factor determining their access to the NIL market. When eligibility ends, so too does a student-athlete's ability to monetize their NIL within the collegiate athletics

ecosystem. In fact, virtually all NIL opportunities for collegiate athletes are directly tied to their active participation in competition.

36.　For athletes like Zeigler, who has built his personal brand and market value through years of competition, the arbitrary termination of eligibility represents not merely the loss of an extracurricular activity but the foreclosure of significant economic opportunity.

37.　The commercial nature of modern collegiate athletics is particularly evident at the highest levels of competition. Division I basketball players, especially those with established reputations like Zeigler, can command substantial NIL compensation that is far higher than opportunities available to him elsewhere.

38.　Data demonstrates conclusively that experience and established performance records are among the most significant drivers of NIL value. NCAA athletes with multiple years of collegiate experience command substantially higher NIL valuations than their less experienced counterparts, even when controlling for all other factors.

39.　Tennessee's NIL collective confirms that players with established performance records and name recognition—typically developed over multiple years of competition—command significantly higher NIL valuations. At the University of Tennessee, seniors and fifth-year players (during the COVID waiver period) represented a disproportionately small percentage of the men's basketball roster but accounted for a significantly larger percentage of total NIL compensation across the team.

40.     For Zeigler specifically, his NIL earning potential in a fifth year of eligibility would substantially exceed his current earning potential due to his established performance record and name recognition. This growth pattern is explained by several factors: upperclassmen typically receive more playing time, have established performance records that brands can rely upon, have developed more substantial social media followings, and have greater name recognition among fans— all factors that significantly enhance their marketability to potential sponsors.

41.     By restricting Zeigler's participation in this market through an arbitrary limitation on player eligibility, the NCAA directly impacts his ability to compete in the commercial marketplace that has emerged in the wake of *Alston*.

42.     The challenged restriction has no legitimate connection to the NCAA's stated educational mission—indeed, it contradicts that mission by denying continued athletic opportunities to student-athletes who have successfully completed their undergraduate education.

43.     And it bars student athletes who take five years to graduate—an academic path endorsed by the NCAA's own rules—the ability to earn NIL compensation in his or her final year of study.

### D. The Four-Seasons Rule's Anticompetitive Effects

44.     The Four-Seasons Rule produces substantial anticompetitive effects on the market for NCAA athlete services. These effects are particularly severe because the rule systematically removes the most valuable and productive participants from the market.

45.     This is impermissible, as "[p]rice fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 110 (2021) (Kavanaugh, J., concurring).

46.     The Four-Seasons Rule artificially constrains the labor market by categorically excluding fifth-year student-athletes from competition—removing approximately 20% of potential participants from the collegiate basketball labor market. This constraint operates as a horizontal restraint through the collective agreement of NCAA member institutions to refuse the services of fifth-year athletes, despite these athletes' continued presence within the NCAA's own five-year eligibility window.

47.     The Four-Seasons Rule functions as a horizontal agreement among competitors—NCAA member institutions—to restrict output in the labor market for Division I athletes. In the post-*Alston* NIL-compensation era, this rule has significant commercial impact by systematically removing the most experienced and valuable participants from the market.

48.     This restraint is even more anticompetitive when viewed in conjunction with the NCAA's redshirt system. When an athlete redshirts, they do not compete in games for a year but remain an active member of the program. During this non-competition year, the institution still extracts substantial value from the athlete, who practices with the team, contributes to teammates' development, may appear in

promotional materials, and generates merchandise sales. Importantly, redshirting athletes typically earn NIL compensation during their redshirt year, meaning they can monetize their name, image, and likeness for all five years of the eligibility window.

49. Most tellingly, it is the institutions—not athletes—that largely control who receives a redshirt year. Schools strategically "bank" the eligibility of promising athletes they believe will deliver greater value in their fifth year, while requiring immediate participation from others. This represents a unilateral exercise of market power to determine when an athlete's value can be monetized and serves institutional interests rather than athlete welfare.

50. This creates a discriminatory two-tier system where "favored" athletes get access to their fifth year within the eligibility window, while "disfavored" athletes are banned from the market during that same year—with the difference determined solely by institutional discretion, not merit or educational achievement. Both groups of athletes are equally within the NCAA's defined five-year eligibility window, but only one group can participate and earn NIL compensation during all five years.

51. What makes this restraint particularly anticompetitive is that it systematically removes the most valuable and productive—and therefore most expensive—participants from the market. Upperclassmen, particularly seniors, are disproportionately more productive on the basketball court than their less experienced counterparts.

52.     Seniors outperform underclassmen in virtually all statistical categories. Across all of Division I men's college basketball, seniors play more minutes, play in more games, are better shooters, rebounders, have more assists, and turn the ball over less than underclassmen.

53.     This pattern of improvement is evident in Zeigler's career. Each year he has played for the University of Tennessee, he has averaged more minutes played, points, assists, and rebounds than the prior year, consistent with the broader trend of player development over time.

54.     These productivity differences directly translate to market value. Senior and fifth-year players on average command substantially higher compensation than underclassmen, reflecting both their superior on-court productivity and the brand equity they've developed over multiple years at their institutions.

55.     For all NCAA athletes, and especially those with established performance records like Zeigler, market value for NIL compensation grows substantially over a collegiate career, increases with each year of competition, and would reach its apex during the fifth year of the five-year eligibility window.

56.     The Four-Seasons Rule's anticompetitive effects are particularly severe because it systematically removes the most productive players from the market precisely when they reach their peak performance levels. Teams with more experienced upperclassmen consistently achieve higher predictive ratings, which correlates with better tournament performance.

57. After adjusting for a team's rating in the previous season, every 10 minutes an upperclassman plays increases a team's performance rating by approximately 0.9 points. If upperclassmen play 50% of minutes for a team, there is an expected increase of 9 points in performance rating compared to a team that only played underclassmen, equivalent to the difference between a median team (ranked 183) and a much higher-ranked team (ranked 99).

58. By arbitrarily cutting off market access after four of those years to some student athletes and not others, the rule prevents NCAA athletes from realizing the full market value of their personal brands at precisely the moment when those brands are most valuable in the five-year eligibility window.

59. By collectively agreeing not to compete for the services of the most productive, valuable, and expensive participants in the market, NCAA member institutions effectively cap the upper end of the compensation scale. The Four-Seasons Rule operates as a *de facto* price control mechanism that artificially suppresses compensation in the market for athletes' labor.

60. This restraint is particularly problematic because it targets precisely those athletes who command the highest market value. In effect, the NCAA and its member institutions have implemented a system that automatically removes the most "expensive" players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market.

61. By removing experienced athletes from competition, the Four-Seasons Rule also reduces the quality of collegiate athletics as a product. Teams with more

experienced players tend to be more successful by winning more games and advancing further in tournaments. The quality and appeal of collegiate basketball is enhanced by the presence of experienced players who exhibit higher skill levels and basketball IQ.

62. History bears this out. "Cinderella" teams—which typically feature multiple seniors among their top contributors—drive more TV viewers to the NCAA Tournament's Final Four than established brands. Examples include George Mason in 2006, Butler and VCU in 2011, and Loyola Chicago in 2018, all of which made unexpected tournament runs with experienced rosters featuring multiple seniors.

63. The artificial exclusion of fifth-year students reduces overall product quality. This reduction in quality ultimately harms consumers of collegiate athletics, who benefit from watching the highest level of competition.

### E. Lack of Procompetitive Justifications

64. The NCAA's purported justifications for the Four-Seasons Rule fail scrutiny under the Rule of Reason. When its eligibility rules have been challenged, the NCAA typically points to the preservation of amateurism, the promotion of competitive balance, and the integration of athletics and education. None of these purported justifications withstands scrutiny in the context of the Four-Seasons Rule, particularly in the post-*Alston* landscape.

65. The academic progress justification is fundamentally undermined by the NCAA's own practices. The NCAA's academic requirements implicitly recognize that many student-athletes require more than four years to graduate. The NCAA's

Progress Toward Degree requirement mandates that student-athletes complete just 20% of their degree requirements each year—a pace that mathematically contemplates a five-year path to graduation.[2]

 

## STUDENT-ATHLETES

# *Staying on Track to Graduate*

Because we believe success in the classroom is just as important as winning on the field, we have standards to ensure student-athletes make progress toward a degree – every year and every season. They need to meet these standards to be eligible to play. Our members have set separate standards that reflect the philosophies and goals of each division.

Our members have set separate standards that reflect the philosophies and goals of each division.

### Division I

- 40 percent of required coursework for a degree must be complete by the end of the second year, 60 percent by the end of the third year and 80 percent by the end of their fourth year.
- Student-athletes are allowed five years of eligibility and athletically related financial aid.
- All Division I student-athletes must earn at least six credit hours each term to be eligible for the following term and must meet minimum grade-point average requirements related to the school's GPA standards for graduation.

66.     In addition, the NCAA frequently touts a graduation rate that is based on a six-year graduation window.[3]

---

[2]     *Staying on Track to Graduate*, NCAA, February 10, 2021, https://www.ncaa.org/sports/2021/2/10/student-athletes-current-staying-track-graduate.aspx.

[3]     Saquandra Heath, *DI Graduation Rates Remain at Highest Level*, NCAA, Nov. 20, 2024, https://www.ncaa.org/news/2024/11/20/media-center-di-graduation-rates-remain-at-highest-level.aspx.



67.     These metrics directly contradict the four-year limitation on athletic participation, revealing the arbitrary nature of the Four-Seasons Rule.

68.     Further undermining the purported academic-progress justification, NCAA rules allow athletes to take a year within the five-year window without competing, and this non-competition year can be taken at any time. Under NCAA rules, an athlete can play two years, leave school entirely, and then return for two more years of competition. There is simply no pro-academic justification for the eligibility window being longer than the seasons the NCAA allows an athlete to compete.

69.     Indeed, the fact that the NCAA's eligibility window is five years long demonstrates that allowing an athlete to play in each of the five years cannot conflict with any purported academic or other purpose the NCAA might claim supports the Four-Seasons Rule.

70.     The redshirt system also reveals that the Four-Seasons Rule lacks legitimate procompetitive justifications. The inconsistency exposes the pretextual

nature of the NCAA's claims: the Four-Seasons Rule cannot be about preserving amateurism, as both redshirt and non-redshirt fifth-year athletes exist within the same eligibility window. It cannot be about academic progress, as graduated athletes remain excluded. And it cannot be about competitive balance, as schools with greater resources can strategically redshirt more athletes.

71.     Instead, the redshirt system demonstrates that the Four-Seasons Rule functions primarily as a market control mechanism. It allows institutions to strategically manipulate the eligibility window to their advantage, extracting maximum value from athletes while denying those same athletes the opportunity to realize their own market value when it peaks.

72.     The rule at issue here forces athletes who have not completed their degrees in four years to make an impossible choice: either remain in school to complete their degree without the ability to earn NIL compensation, athletic scholarships, and other non-NIL benefits in their sport, or abandon their education to pursue professional opportunities that may not be available or sustainable.

73.     For athletes like Zeigler who has completed his undergraduate degree requirements, the academic progress justification collapses entirely. He has already fulfilled the NCAA's educational mission by completing his degree, yet he is still denied the opportunity to compete during his fifth year of eligibility. If the purpose of the rule were truly to promote academic progress, graduated student-athletes would be exempted from its application.

74. Moreover, the NCAA has established numerous exceptions to the Four-Seasons Rule, further undermining any claim that strict adherence to this limitation is necessary. COVID waivers, hardship waivers, redshirts, and other exceptions all allow for more than four years of competition under various circumstances.

75. Furthermore, the NCAA recognizes the benefit of graduate education for athletes who have exhausted their four years of athletics eligibility. Since 1964, the NCAA has awarded up to 126 scholarships of $10,000 to former student-athletes who wish to pursue graduate education.[4] Through this program, the NCAA is willing to fund graduate education so long as an athlete's four years of eligibility has been exhausted. The NCAA's unwillingness to allow Zeigler to compete in the fifth year of his eligibility window demonstrates that the Four-Seasons Rule bears no rational relationship to any legitimate procompetitive purpose and serves merely to stifle competition.

76. The NCAA even permits former professional athletes to compete collegiately in different sports, as exemplified by J.R. Smith's participation in collegiate golf after his NBA career. These exceptions demonstrate that there is no inherent competitive necessity for a strict four-year limit within the five-year eligibility window.

77. Perhaps most tellingly, the NCAA has recently considered amending its bylaws to allow eligibility in the fifth year. This consideration undermines any claim that the current rule serves an essential purpose. The NCAA's own deliberations

---

[4] *NCAA Postgraduate Scholarship Program*, NCAA, https://www.ncaa.org/sports/2013/11/21/ncaa-postgraduate-scholarship-program.aspx.

acknowledge the potential for change without competitive harm, casting doubt on any assertion that the current rule is necessary to achieve procompetitive benefits.

78.     In addition, for four straight years following the COVID pandemic, NCAA athletes were allowed to compete for five years. Competition did not suffer; it thrived. In fact, according to the NCAA, the product was as popular as ever.[5]



79.     The anticompetitive effects of the Four-Seasons Rule cannot be justified by reference to the NCAA's educational mission or competitive needs. The rule's application—particularly to student-athletes who have completed their undergraduate degree and wish to begin graduate-level work—bears no rational relationship to any legitimate procompetitive purpose.

<hr />

[5] Corbin McGuire, *Record Crowds, Rising Ratings and Resurgent Champions Highlight 2025 NCAA Basketball* Championships, NCAA, April 11, 2025, https://www.ncaa.org/news/2025/4/11/media-center-record-crowds-rising-ratings-and-resurgent-champions-highlight-2025-ncaa-basketball-championships.aspx.

## F. Less Restrictive Alternatives

80.     Even if the Court were to find that the Four-Seasons Rule serves some legitimate procompetitive purpose, there is a plainly less restrictive alternative that would achieve the same benefits without the anticompetitive effects. The NCAA could create a graduate eligibility exception that permits an additional year of competition for student-athletes who have completed their undergraduate degrees in four years.

81.     This alternative would achieve the NCAA's purported interest in maintaining the connection between athletics and education while eliminating the arbitrary and anticompetitive exclusion of graduate student-athletes from the market.

82.     Indeed, by allowing athletes who have successfully completed their undergraduate degrees in four years to continue competing within their five-year eligibility window while pursuing graduate education, this alternative would actually further the NCAA's educational mission more effectively than the current rule, which creates perverse incentives for athletes to delay graduation.

83.     It would impose minimal administrative burden on the NCAA, as the association already verifies graduation status for other purposes. And it would prevent the most egregious application of the Four-Seasons Rule—to students who have already fulfilled the NCAA's educational mission.

## G. Irreparable Harm to Plaintiff

84.     Zeigler will suffer irreparable harm without preliminary injunctive relief. The opportunity to participate in collegiate athletics cannot be recovered once lost.

85.     Zeigler faces the loss of substantial NIL opportunities that exist only during his period of eligibility to compete in college athletics. As a successful and established collegiate player, Zeigler stands to earn extraordinary NIL compensation during the 2025-2026 season.

86.     Analysis from Spyre Sports Group indicates that Plaintiff Zeigler could earn between $2 million to $4 million in NIL compensation during the 2025-2026 season if permitted to compete. This opportunity is time-sensitive and cannot be recovered once lost.

87.     The Four-Seasons Rule thus terminates Zeigler's market access at precisely the moment when his market value reaches its apex within the five-year eligibility window—an irreparable injury to his economic interests.

88.     Zeigler faces the loss of critical professional development opportunities. An additional year of collegiate competition would allow him to further develop his skills, enhance his professional prospects, and build his personal brand at the peak of his marketability.

89.     Zeigler will lose the unique opportunity to pursue graduate education while continuing to compete at the highest levels of collegiate basketball—a one-time opportunity that cannot be replicated later in life.

90.     The NIL marketplace operates on a calendar that aligns with the academic and athletic calendar of collegiate sports. The vast majority of significant NIL deals for the upcoming 2025-2026 academic year will be negotiated and finalized between May and June of 2025. For basketball specifically, key NIL opportunities are typically secured by July 1st, as brands seek to align their marketing calendars with the basketball preseason that begins in October.

91.     Without clarity regarding their eligibility status, Zeigler will be excluded from consideration for these time-sensitive opportunities. Corporate partners require certainty regarding an athlete's competition status before committing significant marketing resources.

92.     Similarly, roster decisions for the 2025-2026 basketball season are currently being finalized. Without immediate resolution of their eligibility status, Zeigler faces the risk of losing a roster position for the upcoming basketball season.

93.     The transfer portal, roster management timeline, and NBA's draft withdrawal deadline, create additional timing constraints. Most teams, including the University of Tennessee, will have finalized their rosters by June 2025. Once these decisions are made, even a favorable eligibility ruling later in the summer may come too late for Zeigler to secure a position on the team.

## STATEMENT OF THE CLAIMS

### COUNT I

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
(15 U.S.C. § 1)

94.    Plaintiff incorporates by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

95.    The NCAA and its member institutions, by and through its Four-Seasons Rule, have engaged in a contract, combination, and conspiracy that unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

96.    The NCAA's Four-Seasons Rule is a horizontal agreement among competitors, NCAA member institutions, that restricts competition in the market for student-athlete services and NIL compensation.

97.    The relevant market is the market for student-athlete services and NIL compensation in NCAA Division I basketball. The NCAA possesses market power in this relevant market.

98.    The Four-Seasons Rule has substantial anticompetitive effects in the relevant market, including but not limited to: (a) Artificially restricting the supply of the labor pool by removing approximately 20% of potential participants from the market; (b) Systematically excluding the most productive and valuable participants from the market; (c) Creating an artificial ceiling on NIL compensation by removing the highest-valued segment of the market; (d) Allowing institutions to select certain athletes to redshirt and earn NIL compensation for all five years of their eligibility

window; and (e) Reducing the quality of collegiate athletics as a product for consumers.

99.    The NCAA's purported justifications for the Four-Seasons Rule— including the preservation of amateurism, the promotion of competitive balance, and the integration of athletics and education—do not withstand scrutiny under the Rule of Reason.

100.    The Four-Seasons Rule is not necessary to achieve any legitimate procompetitive objective. Less restrictive alternatives exist that would achieve any legitimate objectives without the anticompetitive effects of the current rule, including a graduate eligibility exception that permits an additional year of competition for student-athletes who have completed their undergraduate degrees in four years.

101.    As a direct and proximate result of the NCAA's unlawful conduct, Plaintiff has suffered and will continue to suffer injury to his business and property, including the loss of substantial NIL compensation opportunities, professional development opportunities, and educational opportunities.

102.    Plaintiff is threatened with loss or damage of the type that the antitrust laws were designed to prevent and that flows from the NCAA's unlawful conduct.

103.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff is entitled to injunctive relief to prevent and restrain the NCAA's violations of the Sherman Act.

## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT
(Tenn. Code Ann. § 47-25-101)

104.    Plaintiff incorporates by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

105.    The NCAA and its member institutions, by and through the NCAA Division I Manual and specifically the Four-Seasons Rule, have engaged in an arrangement, contract, agreement, trust, or combination that tends to lessen full and free competition in trade or commerce affecting the State of Tennessee, in violation of the Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. § 47-25-101.

106.    The NCAA's Four-Seasons Rule constitutes an arrangement, contract, agreement, trust, or combination designed to and which tends to advance, reduce, or control the price or cost to the producer or consumer of services in trade or commerce affecting the State of Tennessee, in violation of Tenn. Code Ann. § 47-25-101.

107.    The Tennessee legislature's recent enactment of Senate Bill 536 ("SB 536") clarifies that Tennessee antitrust law applies to collegiate athletics. This legislation explicitly bars NCAA rules that "tend to lessen competition" in the context of student-athlete name, image, and likeness rights, using language that directly mirrors the TTPA's prohibition against arrangements that "tend to lessen, full and free competition in trade or commerce."

108.    SB 536 specifically addresses the NCAA, requiring that it not "establish, adopt, promulgate, implement, or enforce any rule, standard, procedure, policy, or guideline that violates an applicable state or federal antitrust law." Tenn. Code Ann.

§ 49-7-2802(b)(3)(C) (2025). This provision demonstrates the legislature's unambiguous intent that Tennessee's antitrust laws—including the TTPA—apply with full force to NCAA regulations affecting student-athletes within Tennessee.

109. SB 536 states that the NCAA shall not "[i]nterfere with, prohibit, restrict, or otherwise adversely affect an intercollegiate athlete's ability to earn compensation . . . and shall not otherwise impact an intercollegiate athlete's eligibility or full participation in intercollegiate athletic events." Tenn. Code Ann. § 49-7-2803(a)(1) (2025).

110. The legislation's declaration that restrictions that "lessen, or tend to lessen, full and free competition in trade or commerce affecting this State" are contrary to public policy serves as a legislative interpretation of the TTPA's scope. This declaration confirms that the TTPA applies to the NCAA's Four-Seasons Rule, which restricts competition in the market for Division I athlete services and NIL compensation.

111. When read together with the TTPA, SB 536 creates a coherent state policy against anticompetitive restrictions in collegiate athletics.

112. The NCAA's Four-Seasons Rule has substantial anticompetitive effects, including but not limited to: (a) artificially restricting the supply of available labor pool by removing approximately 20% of potential participants from the market; (b) systematically excluding the most productive and valuable participants from the market; (c) allowing institutions to choose which players can redshirt and therefore earn NIL compensation for all five years of the eligibility window while

others cannot; (d) creating an artificial ceiling on NIL compensation by removing the highest-valued segment of the market; and (e) reducing the quality of collegiate athletics as a product for consumers.

113. The NCAA's Four-Seasons Rule directly affects trade and commerce within Tennessee, as it impacts: (a) The University of Tennessee's ability to field competitive teams; (b) The economic opportunities available to Tennessee athletes; (c) The quality of collegiate sports products available to Tennessee consumers; (d) The production and sale of tangible merchandise bearing Plaintiff's name, image, and likeness; and (e) The broader Tennessee economy through reduced economic activity related to collegiate sports.

114. The NCAA's purported justifications for the Four-Seasons Rule do not withstand scrutiny under the Rule of Reason analysis applicable to both federal and state antitrust claims in Tennessee.

115. As a direct and proximate result of the NCAA's unlawful conduct, Plaintiff has suffered and will continue to suffer injury to his business and property within Tennessee, including the loss of substantial NIL compensation opportunities, professional development opportunities, educational opportunities, and the ability to produce and sell tangible merchandise bearing his name, image, and likeness.

116. Plaintiff is threatened with loss and damage that the TTPA was designed to prevent and that flows from the NCAA's unlawful conduct.

117. Pursuant to Tenn. Code Ann. § 47-25-101 and Tennessee common law, Plaintiff is entitled to injunctive relief to prevent and restrain the NCAA's violations of the TTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

a. That a jury of 12 persons be empaneled to try this case;

b. A declaratory judgment that the NCAA's Four-Seasons Rule violates Section 1 of the Sherman Act;

c. A declaratory judgment that the NCAA's Four-Seasons Rule violates the Tennessee Trade Practices Act;

d. A preliminary and permanent injunction enjoining the NCAA from enforcing the Four-Seasons Rule against Plaintiff and permitting him to compete during the 2025-2026 basketball season while pursuing his graduate degree;

e. An award of costs and reasonable attorneys' fees under Section 16 of the Clayton Act, 15 U.S.C. § 26; and

f. Such other and further relief as the Court deems just and equitable.

Date: May 20, 2025

Respectfully submitted,

*/s/ Zachary C. Lawson*
Zachary C. Lawson (TN BPR #36092)
J. Alex Little (TN BPR #29858)
LITSON PLLC
111 East Jackson Ave, Suite 203
Knoxville, TN 37915
Telephone: 615-985-8205
zack@litson.co | alex@litson.co

30

_/s/ Marcos M. Garza_
Marcos M. Garza (TN BPR #21483)
Brent Morris (TN BPR #24621)
Anderson Cofer (*Pro Hac* Pending)
GARZA LAW FIRM, PLLC
550 W. Main Street, Suite 340
Knoxville, Tennessee 37902
Telephone: 865-540-8300
Mgarza@garzalaw.com

*Attorneys for Plaintiff*

31