## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

ZAKAI ZEIGLER,                                )
                                              )
    Plaintiff,                          )
                                              )   Case No. <u>3:25-cv-00226</u>
v.                                            )
                                              )
NATIONAL COLLEGIATE                           )
ATHLETIC ASSOCIATION,                         )
                                              )
    Defendant.                          )
                                              )

## <u>AMENDED MEMORANDUM OF LAW IN SUPPORT OF</u><br><u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiff Zakai Zeigler is an accomplished student and athlete who diligently completed his undergraduate degree in four years, all while excelling in his chosen sport of basketball. Now, he seeks to compete in the fifth year of his five-year eligibility window while pursuing a graduate degree. But he finds himself arbitrarily barred from doing so by an NCAA rule that limits athletes to participating in only four seasons of intercollegiate competition within the five-year window (the "Four-Seasons Rule"). As a result, he cannot compete or earn NIL compensation during his fifth year—the most lucrative year of the eligibility window for the vast majority of athletes.

Many players, however, do compete in the fifth year of their eligibility window. And they can earn NIL compensation for all five of those years. Had Zeigler been withheld from competing in sports during one of those four years, perhaps by redshirting, the NCAA rules would permit him to participate again next year.

Through the redshirt system, NCAA institutions—not athletes—largely control who gets access to the fifth year of eligibility, strategically "banking" eligibility for some athletes while denying it to others, without consideration, based purely on institutional preference and benefit. But, because Zeigler participated in athletics for four consecutive years, the NCAA bars him from representing his school in interscholastic competition in the fifth year of the competition window—and thereby excludes him from the market for NIL compensation.

All NCAA athletes should be eligible to compete during each year of the five-year window. And they should be able to earn NIL compensation during each year of the five-year window—not just those selected to redshirt. By prohibiting fifth-year competition for most athletes, including Zeigler, the NCAA eliminates the most experienced, productive, and highest-paid group of players from the labor pool, creating a substantial anticompetitive effect that furthers no academic purpose. And as a result, the market output—the product viewed by consumers—is harmed.

This is no small matter. Without the Court's intervention, Zeigler faces an imminent and irreparable injury. In turn, he seeks preliminary injunctive relief to permit him to compete in the 2025-2026 basketball season while he pursues a graduate degree. Without such relief, Zeigler will lose irreplaceable opportunities for athletic development, NIL compensation, and the chance to enhance his professional prospects—harms that cannot be adequately remedied by damages alone. Meanwhile, the NCAA will suffer no meaningful harm from allowing these

academically successful athletes to participate in all athletic seasons within the five-year eligibility window.

The law and equities overwhelmingly favor Zeigler. He is substantially likely to succeed on his Sherman Act claim because the NCAA's Four-Seasons Rule constitutes an unreasonable restraint of trade with no legitimate procompetitive justification in the post-*Alston* landscape. The balance of hardships tilts decidedly in Zeigler's favor, and the public interest would be served by an injunction that aligns athletic eligibility with educational achievement rather than an arbitrary temporal limitation.

The invalidity of the Four-Seasons Rule is particularly glaring given that the NCAA's own academic requirements implicitly recognize that the average NCAA athlete requires more than four years to graduate. The NCAA acknowledges this in at least three ways: (i) its Progress Toward Degree requirements anticipating a five-year path to graduation by requiring that athletes complete just 20% of their credit hours each year; (ii) the redshirt rule allowing a five-year participation model, and (iii) the NCAA's much-touted graduation rate, which is measured based on a six-year graduation window. In the face of these facts, the NCAA itself has recently considered amending its bylaws to allow athletes to compete during all five years of the eligibility window, further undermining any claim that the current Four-Seasons Rule serves a procompetitive purpose.

To be clear, Zeigler does not challenge the overall five-year window, but rather the arbitrary four-year competition limitation within it. Indeed, permitting NCAA

athletes like Zeigler to compete while pursuing graduate degrees in their fifth year of eligibility would further the NCAA's purported academic mission far more effectively than other widely accepted NCAA practices like redshirting.

For these reasons, and as more fully explained below, this Court should grant Zeigler's motion for a preliminary injunction and enjoin the NCAA from enforcing the Four-Seasons Rule against him.

## LEGAL BACKGROUND

The Sherman Antitrust Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." While courts have long recognized that this language cannot be interpreted literally to prohibit every agreement that restrains trade, the Act has been construed to prohibit "unreasonable" restraints. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 54 (1911). The Clayton Act complements the Sherman Act by prohibiting specific anticompetitive practices and providing for private enforcement through treble damages and injunctive relief. 15 U.S.C. §§ 15, 26.

The antitrust laws apply with full force to the sports industry, including both professional and collegiate sports. The Supreme Court first applied the Sherman Act to sports leagues in *Radovich v. National Football League*, 352 U.S. 445 (1957), rejecting the notion that professional football enjoyed a blanket exemption from antitrust scrutiny. This principle was extended to baseball in *Flood v. Kuhn*, 407 U.S. 258 (1972), and has since been applied across the spectrum of professional sports.

In the professional sports context, courts have recognized that league-wide rules restricting player movement or limiting compensation can constitute unreasonable restraints of trade. *Mackey v. National Football League*, 543 F.2d 606, 623 (8th Cir. 1976). In response, professional sports leagues have largely avoided antitrust liability for such rules through collective bargaining with player unions. Under the "non-statutory labor exemption," restraints that are the product of bona fide arm's-length collective bargaining are exempt from antitrust scrutiny. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996).

No such exemption exists in collegiate sports. The NCAA has long been subject to the Sherman Act, as the Supreme Court first recognized in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), which struck down the NCAA's television broadcasting restrictions. While *Board of Regents* suggested that the NCAA's eligibility rules might be entitled to a more deferential approach under the antitrust laws, the Court's recent decision in *NCAA v. Alston*, 594 U.S. 69 (2021), made clear that all NCAA rules with commercial impact are subject to "Rule of Reason" analysis.

In *Alston*, the Supreme Court unanimously affirmed that the NCAA's compensation restrictions violated the Sherman Act, rejecting the NCAA's arguments for special treatment under the antitrust laws. The Court emphasized that "the NCAA is not above the law" and that its business model would receive no special dispensation from ordinary antitrust principles. *Id.* at 90-91. Justice Kavanaugh's concurrence went further, noting that the NCAA's remaining compensation rules also

"raise serious questions under the antitrust laws" and questioning the NCAA's business model more broadly. *Id.* at 110-11 (Kavanaugh, J., concurring).

The wake of *Alston* has seen significant challenges to NCAA eligibility rules. In *Pavia v. NCAA*, No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024), the district court held that "when the NCAA lifted the restriction on NIL compensation, rules regulating who can play—i.e., who can enter the labor market—became 'commercial in nature'" and thus subject to Sherman Act scrutiny. *Id.* at *1. Similarly, in *Fourqurean v. NCAA*, No. 3:25-cv-00068-wmc, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025), the district court granted a preliminary injunction against the NCAA's Five-Year Rule, finding that the plaintiff was likely to succeed on his Sherman Act claim.

The fundamental unfairness of the NCAA's current position is that it seeks to impose market restrictions without the protections that would typically accompany such restrictions in a professional sports context. Professional sports leagues can impose similar constraints on player mobility and compensation, but they do so through collective bargaining, which provides players with both a voice in rule-making and compensatory benefits like minimum salaries, healthcare, and pension plans. *See Mackey*, 543 F.2d at 614-15. The NCAA, by contrast, unilaterally imposes market restrictions without any corresponding system of collective bargaining or player representation. *See Alston*, 594 U.S. at 111 (Kavanaugh, J., concurring).

If the NCAA wishes to maintain rules that limit competition in the labor market for NCAA athlete services, it has two options: either justify those rules with

genuine procompetitive benefits under the Rule of Reason or establish a collective bargaining relationship with the athletes. Unless and until it chooses the latter, it must do the former. The NCAA's market restrictions remain fully subject to antitrust scrutiny, and rules that lack legitimate procompetitive justifications—like the Four-Seasons Rule—cannot stand.

## FACTUAL BACKGROUND

### A. The NCAA and Its Bylaws

The NCAA is a membership organization comprised of over 1,000 colleges and universities that compete in intercollegiate athletics. Through its complex web of bylaws, the NCAA exercises plenary control over virtually every aspect of athlete eligibility. The NCAA Division I Manual sets forth the byzantine rules that govern participation in the highest level of collegiate sports.

Central to this case is the "Four-Seasons Rule," which limits NCAA athletes to four seasons of competition within a five-year period beginning when the athlete first enrolls in a collegiate institution. NCAA Division I Bylaw 12.8 provides that "[a] student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" and further specifies that "[a] student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." This rule applies uniformly to all athletes, regardless of whether they have

successfully completed their undergraduate degrees within the traditional four-year timeframe.

## B. Zeigler's Academic and Athletic Career

Plaintiff Zakai Zeigler is an exemplar of the NCAA's stated educational mission. He has successfully balanced the rigorous demands of Division I athletics with academic excellence, completing his undergraduate degree in four years—a rate that exceeds that of the general student population.[1]

Zeigler enrolled at the University of Tennessee in 2021 and has played four consecutive seasons of NCAA Division I men's basketball from the 2021-22 season through the 2024-25 season. (Exhibit 1: Declaration of Zakai Zeigler at ¶ 4.)[2] During his time at the University of Tennessee, Zeigler has achieved remarkable success both academically and athletically.

Zeigler holds the record for most assists (747) and most steals (251) in Tennessee basketball team history. (*Id.* at ¶ 6.) He was named the 2025 Defensive Player of the Year of the Southeastern Conference ("SEC") and was selected to the All-SEC First Team for the 2024-2025 season. (*Id.* at ¶ 7.) He has been named to the SEC Academic Honor Roll on numerous occasions: 2021-22 Year, 2022-23 Winter, 2023-24 Winter, and 2024-25 Winter. (*Id.* at ¶ 9.)

---

[1] Abigail Hess, *Graduating in 4 Years or Less Helps Keep College Costs Down—But Just 41% of Students Do*, CNBC, Jun. 19, 2019, https://www.cnbc.com/2019/06/19/just-41percent-of-college-students-graduate-in-four-years.html.

[2] Exhibits 1-4 herein are attached to the Motion for Preliminary Injunction.

Despite suffering a season-ending ACL tear during his sophomore season, Zeigler demonstrated remarkable resilience, returning to play and maintaining his academic progress. (*Id.* at ¶ 10.) He graduated from the University of Tennessee in May 2025 with a bachelor's degree in retail and merchandising management, completing his undergraduate education in four years while meeting or exceeding all academic requirements. (*Id.* at ¶ 11.)

Zeigler contributed significantly to the University of Tennessee basketball program's success, including NCAA tournament Elite Eight appearances in 2024 and 2025, a Sweet Sixteen appearance in 2023, winning the SEC Tournament Championship in 2022, and capturing the SEC Regular Season Championship in 2024. (*Id.* at ¶ 8.)

Zeigler has received substantial financial compensation through NIL agreements during his college basketball career. Zeigler earned approximately $150,000 in his first year (2021-22 season). (*Id.* at ¶ 17.) His NIL compensation has grown each year. (*Id.*) In his fourth year (2024-25 season), he earned approximately $500,000 in NIL compensation. (*Id.*)

Based on projections from Spyre Sports Group, the NIL collective associated with the University of Tennessee, Zeigler's NIL valuation for the 2025-26 season ranges from $2 million to $4 million. (*Id.* at ¶ 18.) This valuation reflects the market value of an upperclassman with a proven performance record and high visibility, especially in a high-profile conference like the SEC. (*Id.*)

9

Zeigler now wishes to pursue graduate education while continuing his athletic career for one additional season. (*Id.* at ¶ 14.) He intends to enroll in a graduate program beginning in the fall of 2025. (*Id.*) Absent relief from this Court, however, Zeigler will be precluded from athletic competition in the 2025-2026 season by operation of the NCAA's Four-Seasons Rule, despite his exemplary academic achievement and the fact that he has already fulfilled the NCAA's stated educational purpose.

### C. NIL Compensation and Post-*Alston* Changes

The landscape of collegiate athletics has undergone a seismic shift following the Supreme Court's decision in *NCAA v. Alston* and the subsequent recognition of NCAA athletes' rights to compensation for their name, image, and likeness. (Exhibit 2: Declaration of Dr. Joel G. Maxcy at ¶¶ 17-19.) What was once characterized as an amateur endeavor has evolved into a multi-billion-dollar commercial enterprise in which athletes can now receive substantial compensation through NIL deals. (*Id.*)

This transformation fundamentally alters the analysis of NCAA eligibility rules. (*Id.* at ¶ 1.) NIL opportunities are directly tied to an athlete's eligibility to compete—when eligibility ends, so too does access to the lucrative market for NIL compensation. (Exhibit 3: Declaration of James Clawson at ¶¶ 8-9.) An NCAA athlete's eligibility to compete is the single most important factor determining their access to the NIL market. (*Id.* at ¶ 8.) When eligibility ends, so too does a NCAA athlete's ability to monetize their NIL within the collegiate athletics ecosystem. (*Id.*) In fact, virtually all NIL opportunities for collegiate athletes are directly tied to their

active participation in competition. (*Id.* at ¶ 9.) For athletes like Zeigler, who has built his personal brand and market value through years of competition, the arbitrary termination of eligibility represents not merely the loss of an extracurricular activity but the foreclosure of significant economic opportunity. (*Id.* at ¶¶ 29-30; Exh. 1: Declaration of Zakai Zeigler at ¶¶ 16-18.)

The commercial nature of modern collegiate athletics is particularly evident at the highest levels of competition. (Exh. 3: Declaration of James Clawson at ¶¶ 11-16.) Division I basketball players, especially those with established reputations like Zeigler, can command substantial NIL compensation that is far higher than opportunities available to them elsewhere. (*Id.* at ¶¶ 11-13; Exh. 1: Declaration of Zakai Zeigler at ¶¶ 16-18.) Data demonstrates conclusively that experience and established performance records are among the most significant drivers of NIL value. (Exh. 3: Declaration of James Clawson at ¶ 12.) Athletes with multiple years of collegiate experience command substantially higher NIL valuations than their less experienced counterparts, even when controlling for all other factors. (*Id.*) Tennessee's NIL collective confirms that players with established performance records and name recognition—typically developed over multiple years of competition—command significantly higher NIL valuations. (*Id.* at ¶¶ 15-16.) At the University of Tennessee, seniors and fifth-year players (during the COVID waiver period) represented a disproportionately small percentage of the men's basketball roster but accounted for a significantly larger percentage of total NIL compensation across the team. (*Id.* at ¶ 16.)

For Zeigler specifically, his NIL earning potential in a fifth year of eligibility would substantially exceed his current earning potential due to his established performance record and name recognition. (*Id.* at ¶¶ 20-22; Exh. 1: Declaration of Zakai Zeigler at ¶ 18.) This growth pattern is explained by several factors: upperclassmen typically receive more playing time, have established performance records that brands can rely upon, have developed more substantial social media followings, and have greater name recognition among fans—all factors that significantly enhance their marketability to potential sponsors. (Exh. 3: Declaration of James Clawson at ¶ 14.)

By restricting athletes' participation in this market through an arbitrary limitation on player eligibility, the NCAA directly impacts athletes' ability to compete in the commercial marketplace that has emerged in the wake of *Alston*. (*Id.* at ¶ 10; Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶¶ 17-19.) The challenged restriction has no legitimate connection to the NCAA's stated educational mission—indeed, it contradicts that mission by denying continued athletic opportunities to its athletes who have successfully completed their undergraduate education.[3] And it bars athletes who take five years to graduate—an academic path endorsed by the NCAA's own rules—the ability to earn NIL compensation in his or her final year of study. This is an antitrust violation under the Sherman Act and Tennessee's antitrust statute, and the Court should enjoin it.

---

[3] *Academics*, NCAA, https://www.ncaa.org/sports/2021/2/10/about-what-we-do-academics.aspx.

**ARGUMENT**

To obtain a preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). When the government is not a party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Each of these factors weighs decisively in Zeigler's favor.

**I.    Likelihood of Success on the Merits**

    A.   <u>The Sherman Act Applies.</u>

       *1.   The Eligibility Rule at Issue is Commercial in Nature.*

The threshold question in any Sherman Act challenge to NCAA rules is whether the challenged rule is "commercial" in nature. *Worldwide Basketball and Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004). In the post-*Alston* landscape, many of the NCAA's eligibility rules—and particularly those that directly determine access to the NIL market—are indisputably commercial.

The Supreme Court in *Alston* recognized that the NCAA's compensation restrictions are subject to antitrust scrutiny precisely because they regulate commercial activity—the labor market for athlete services. 594 U.S. at 86-87. While the Court did not directly address eligibility rules, Justice Kavanaugh's concurrence emphasized that "the NCAA's remaining compensation rules also raise serious questions under the antitrust laws," and that "[p]rice-fixing labor is price-fixing labor." *Id.* at 110-11 (Kavanaugh, J., concurring).

13

Courts examining NCAA eligibility rules following *Alston* have recognized their commercial nature. In *Pavia v. NCAA*, the court held that "when the NCAA lifted the restriction on NIL compensation, rules regulating who can play—i.e., who can enter the labor market—became 'commercial in nature.'" No. 3:24-cv-1336, 2024 WL 5159888, at *1 (M.D. Tenn. Dec. 18, 2024). The *Pavia* court reasoned that "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." *Id.*

While pre-*Alston* decisions like *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), and *Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998), treated eligibility rules as non-commercial, those decisions preceded the NIL era when eligibility had little to no impact on athlete compensation. As the *Pavia* court recognized, "in the post-*Alston* world in which student-athletes can obtain NIL compensation, *Bassett*, *Gaines*, and other pre-*Alston* cases simply do not apply." 2024 WL 5159888, at *1. The fundamental economic transformation of collegiate athletics has rendered these earlier precedents inapplicable to the current regulatory landscape.

The commercial nature of the Four-Seasons Rule is particularly evident when examining its direct impact on NIL compensation opportunities. Data from Tennessee's NIL collective demonstrates that eligibility directly determines market access and compensation potential. (Exh. 3: Declaration of James Clawson at ¶¶ 8-10.) These are not speculative economic effects but concrete commercial impacts that directly affect the marketplace for athlete services.

To be sure, not all NCAA eligibility rules are commercial in nature. For example, bylaws related to drug use or other conduct violations may render a player ineligible for some period, but these rules do not remove the player from the NIL market altogether—they merely impose temporary disciplinary measures. Similarly, academic eligibility requirements like GPA minimums may temporarily sideline a player but are more closely tied to the NCAA's educational mission. And a player can improve his or her GPA to regain eligibility.[4] The Four-Seasons Rule is of a different kind and stands in stark contrast to these other eligibility provisions because it categorically and permanently removes athletes from the market (i) despite their continued presence within the five-year window, (ii) regardless of their academic achievement, and (iii) without any pro-competitive benefit to any relevant market.

The NCAA's own commercial treatment of eligibility further demonstrates the commercial nature of the Four-Seasons Rule:

1. The NCAA has developed NIL policies with direct consideration of how eligibility rules affect the market.[5]

2. The NCAA and its member institutions engage in extensive marketing and monetization of eligibility-dependent events, generating billions in revenue from the labor of eligible NCAA athletes.[6]

---

[4] Even if all eligibility rules are commercial in nature, as the *Pavia* court suggests, these rules can still survive under the Rule of Reason analysis if they have pro-competitive justifications.

[5] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations,* NCAA, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf.

[6] *Finances*, NCAA, May 4, 2021, https://www.ncaa.org/sports/2021/5/4/finances.aspx.

3. The NCAA's revenue distribution patterns to member institutions are directly tied to eligibility decisions, with revenues flowing based on which athletes are permitted to compete.[7]

4. The NCAA's commercial partnerships with television networks, corporate sponsors, and other entities depend on the participation of eligible athletes, further demonstrating the commercial nature of eligibility determinations. *Alston*, 594 U.S. at 79-80.

The Four-Seasons Rule is especially commercial when applied to athletes who have already graduated, like Zeigler, but who wish to continue their education for another year (which keeps them within the five-year eligibility window) at an NCAA institution. Having fulfilled the NCAA's asserted educational mission, any restrictions on their continued athletic participation serve only to limit their access to the market for their services. This market-access restriction directly impacts the commercial opportunities available to NCAA athletes and constitutes a quintessentially commercial restraint.

The economic reality is that the Four-Seasons Rule now directly controls access to a billion-dollar market for athlete compensation. Unlike the pre-NIL era when courts viewed eligibility rules as "explicitly non-commercial," the advent of NIL compensation has fundamentally changed the economic analysis. When an eligibility rule—or any rule—directly determines market access, the rule is inherently

---

[7] *See Brief on* House v. NCAA *Settlement*, KNIGHT COMMISSION ON INTERCOLLEGIATE ATHLETICS, Feb. 12, 2025, https://www.knightcommission.org/wp-content/uploads/KnightCommissionBrief_HousevNCAA_182025.pdf.

commercial in nature. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 18.) Accordingly, the Four-Seasons Rule must pass the Rule of Reason analysis to survive under the Sherman Act. It does not.

<u>B. The Rule Constitutes an Unreasonable Restraint of Trade.</u>

Having established that the Four-Seasons Rule is commercial in nature, the Court must analyze whether it constitutes an unreasonable restraint of trade under the Sherman Act's Rule of Reason framework. This framework involves a three-step, burden-shifting analysis: (1) the plaintiff must show that the challenged restraint has substantial anticompetitive effects; (2) the defendant must offer legitimate procompetitive justifications; and (3) the plaintiff must demonstrate that the procompetitive benefits could be achieved through less restrictive means. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018).

### Step One: Substantial Anticompetitive Effects

The Four-Seasons Rule produces substantial anticompetitive effects on the market for NCAA athlete services. These effects are particularly severe because the rule systematically removes the most valuable and productive participants from the market.

**a. Anticompetitive Distortion of the Labor Market Through Collective Exclusion**

The Four-Seasons Rule artificially constrains the labor market by categorically excluding fifth-year athletes from competition—removing approximately 20% of potential participants from the collegiate basketball labor market. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 21.) This constraint operates as a horizontal

restraint through the collective agreement of NCAA member institutions to refuse the services of fifth-year athletes, despite these athletes' continued presence within the NCAA's own five-year eligibility window. (*Id.*) This collective refusal to deal constitutes a classic form of anticompetitive conduct. (*Id.* at ¶¶ 21-22.) The Four-Seasons Rule functions as a horizontal agreement among competitors—NCAA member institutions—to restrict output in the labor market for athlete services. (*Id.* at ¶ 13.)

What makes this restraint particularly anticompetitive is that it systematically removes the most valuable and productive participants from the market. (*Id.* at ¶ 22.) Upperclassmen, particularly seniors, are disproportionately more productive on the basketball court than their less experienced counterparts. (Exhibit 4: Declaration of Dr. Paul Sabin at ¶¶ 8-10.) Seniors outperform underclassmen in virtually all statistical categories. (*Id.* at ¶ 9.) Across all Division I men's college basketball, seniors play more minutes, play in more games, are better shooters, rebounders, record more assists, and turn the ball over less than underclassmen players. (*Id.* at ¶ 10.) Not only does the average senior perform better than the average freshman, sophomore, or junior, but seniors are over-represented in the top 100 of most advanced individual player metrics. (*Id.* at ¶ 10.)

This pattern of improvement is evident in Zeigler's career. (*Id.* at ¶ 11.) Each year he has played for the University of Tennessee, Zeigler has averaged more minutes played, points, assists, and rebounds than the prior year, consistent with the broader trend of player development over time. (*Id.*)

The Four-Seasons Rule's anticompetitive effects are particularly severe because it systematically removes the most productive players from the market precisely when they reach their peak performance levels within the five-year eligibility window. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶¶ at 22-24.) Teams with more experienced upperclassmen consistently achieve higher predictive ratings, which correlates with better tournament performance. (Exh. 4: Declaration of Dr. Paul Sabin at ¶¶ 12-13.)

After adjusting for a team's rating in the previous season, every 10 minutes an upperclassman plays increases a team's performance rating by approximately 0.9 points. (*Id.* at ¶ 12.) If upperclassmen play 50% of minutes for a team, there is an expected increase of 9 points in performance rating compared to a team that only played underclassmen, equivalent to the difference between a median team (ranked 183) and a much higher-ranked team (ranked 99). (*Id.*)

These productivity differences directly translate to market value. NIL compensation data shows that senior and fifth-year players command substantially higher compensation than underclassmen, reflecting both their superior on-court productivity and the brand equity they have developed over multiple years at their institutions. (Exh. 3: Declaration of James Clawson at ¶¶ 12-16.)

For all NCAA athletes, and especially those with established performance records like Zeigler, market value for NIL compensation grows substantially over a collegiate career, increases with each year of competition, and would reach its apex during the fifth year of the five-year eligibility window. (*Id.* at ¶¶ 15-17.) By

19

arbitrarily cutting off market access after four of those years to some athletes and not others, the rule prevents athletes from realizing the full market value of their personal brands at precisely the moment when those brands are most valuable. (*Id.* at ¶ 17; Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 26.)

Zeigler's NIL compensation has grown substantially over his collegiate career. In his first season, Zeigler earned approximately $150,000 in NIL compensation. (Exh. 1: Declaration of Zakai Zeigler at ¶ 17; Exh. 3: Declaration of James Clawson at ¶ 19.) In his fourth season, Zeigler earned approximately $500,000 in NIL compensation. (*Id.*) According to Tennessee's NIL collective, Zeigler's valuation for a fifth season ranges from $2 million to $4 million. (Exh. 1: Declaration of Zakai Zeigler at ¶ 18; Exh. 3: Declaration of James Clawson at ¶¶ 21-22.)

By collectively agreeing not to compete for the services of the most productive and valuable participants in the market, NCAA member institutions effectively cap the upper end of the compensation scale. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 27.) The Four-Seasons Rule operates as a *de facto* price control mechanism that artificially suppresses compensation in the market for athlete services. (*Id.*) This agreement to exclude the highest-valued segment of the market is a textbook example of anticompetitive collusion. (*Id.* at ¶¶ 27-28.)

This restraint is particularly problematic because it targets precisely those athletes who command the highest market value. (*Id.* at ¶ 28.) In effect, the NCAA and its member institutions have implemented a system that automatically removes the most "expensive" players from the market each year, creating an artificial ceiling

on compensation that would not exist in a competitive market. (*Id.*) This systematic exclusion of the highest-valued segment of the market constitutes a quintessential anticompetitive restraint. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).

The redshirt system—which allows athletes to practice with the team but not compete in games for one year, thereby preserving a season of eligibility—creates a glaring inconsistency that undermines the NCAA's purported justifications for limiting competition to four seasons within the five-year window. (*Id.* at ¶¶ 32-33.) And because the institutions control which players take redshirt years, it also serves as another way the NCAA manipulates the labor market for the benefit of the institutions. By picking and choosing which athletes are allowed to compete during their fifth year and receive peak NIL compensation, NCAA institutions effectively control the market's "winners" and "losers." (*Id.*) This is the type of classic anticompetitive restraint the Sherman Act prohibits. *See Microsoft Corp.*, 253 F.3d at 58.

### b. Consumer Welfare Reduction

Some agreements "so obviously threaten to reduce output . . . that they might be condemned as unlawful *per se* . . . ." *Alston*, 594 U.S. at 89.

By removing experienced athletes from competition, the Four-Seasons Rule also reduces the quality of collegiate athletics as a product. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 38, Exh. 4: Declaration of Dr. Paul Sabin at ¶¶ 12-14.) This

quality reduction directly harms consumers, who benefit from watching experienced, skilled athletes. (*Id.*)

Teams with more experienced players tend to be more successful by winning more games and advancing further in tournaments. (Exh. 4: Declaration of Dr. Paul Sabin at ¶¶ 12-13.) The quality and appeal of collegiate basketball is enhanced by the presence of experienced players who exhibit higher skill levels and basketball IQ. (*Id.*)

History bears this out. "Cinderella" teams—which typically feature multiple seniors among their top contributors—drive more TV viewers to the NCAA Tournament's Final Four than established brands. (*Id.* at ¶ 14.) Examples include George Mason in 2006, Butler and VCU in 2011, and Loyola Chicago in 2018, all of which made unexpected tournament runs with experienced rosters featuring multiple seniors. (*Id.*)

In addition, for four straight years following the COVID pandemic, athletes were allowed to compete for five years. Competition did not suffer; it thrived.[8] The 2025 NCAA Division I Men's Basketball Tournament saw a substantial increase in viewership and attendance, reflecting heightened national interest in college basketball. The championship game averaged 18.1 million viewers—a 22% increase from the prior year and the highest since 2019—while the Final Four semifinals averaged 15.5 million viewers, the best numbers since 2017. The tournament

---

[8] Remy Tumin, *Are Super Seniors the Secret to N.C.A.A. Tournament Success?* THE NEW YORK TIMES, Apr. 2, 2022, https://www.nytimes.com/2022/04/02/sports/ncaabasketball/super-seniors-college-basketball.html.

averaged 9.4 million viewers per game through the Round of 32—the highest since 1993—and attracted over 700,000 fans in person, including a sold-out crowd of 68,252 for the Final Four.[9] The unprecedented increase in tournament popularity can be attributed, in substantial part, to the superior athletic performance demonstrated by athletes exercising their COVID-19 eligibility extension. Because they received an additional year of eligibility, these veteran players showed elite skill sets and a leadership presence that elevated the overall tournament quality. Many players had evolved into household names after five collegiate seasons, creating deeper fan connections and compelling storylines that resonated with viewers across the country.

Fifth-year players who received an extra year of eligibility due to the COVID-19 waiver transformed the landscape of NCAA men's basketball. The average experience level for Division I men's basketball players increased from 2.41 years in the 2018-19 season to 2.62 years in 2024-25. Teams like Louisville, Xavier, and Middle Tennessee boasted combined average experience levels of 3.78 years.[10] This trend has translated into tangible success on the court; for instance, all four teams in the 2024 Final Four included at least one fifth-year player, with N.C. State featuring three.[11] Notable players such as RJ Davis of North Carolina, Hunter Dickinson of

---

[9] https://www.ncaa.org/news/2025/4/11/media-center-record-crowds-rising-ratings-and-resurgent-champions-highlight-2025-ncaa-basketball-championships.aspx

[10] COVID-19 Led to Extra College Eligibility. Those 5th-Year Players Are Set for Their Last Runs, NBC SPORTS, Oct. 30, 2024, https://www.nbcsports.com/college-basketball/news/covid-19-led-to-extra-college-eligibility-those-5th-year-players-are-set-for-their-last-runs.

[11] *Id.*

Kansas, and Mark Sears of Alabama exemplify the impact of this experience, contributing significantly to their teams' performances. Their prolonged presence in college basketball has not only improved team dynamics but also fostered deeper connections with fans, enhancing the overall appeal and competitiveness of NCAA basketball.

This evidence suggests that the artificial exclusion of fifth-year students who have played the prior four years reduces overall product quality. (*Id.* at ¶ 15.) This reduction in quality ultimately harms consumers of collegiate athletics, who benefit from watching the highest level of competition, as demonstrated by viewership and engagement data.[12] (*Id.* at ¶ 15.)

### *Step Two: The NCAA's Purported Procompetitive Justifications Fail*

Having demonstrated the substantial anticompetitive effects of the Four-Seasons Rule, the analysis proceeds to the second step of the Rule of Reason framework: whether there are legitimate procompetitive justifications for the restraint. When its eligibility rules have been challenged, the NCAA typically points to the preservation of amateurism, the promotion of competitive balance, and the integration of athletics and education. None of these purported justifications withstands scrutiny in the context of the Four-Seasons Rule, particularly in the post-*Alston* landscape.

---

[12] Remy Tumin, *Are Super Seniors the Secret to N.C.A.A. Tournament Success?* THE NEW YORK TIMES, Apr. 2, 2022, https://www.nytimes.com/2022/04/02/sports/ncaabasketball/super-seniors-college-basketball.html.

The academic progress justification is fundamentally undermined by the NCAA's own practices. For example, the NCAA's academic requirements implicitly recognize that many athletes require more than four years to graduate. The NCAA's Progress Toward Degree requirement mandates that athletes complete just 20% of their degree requirements each year—a pace that mathematically contemplates a five-year path to graduation.[13]

In addition, the NCAA frequently touts its graduation rate, which is based on a six-year graduation window.[14]



These metrics directly contradict the four-year limitation on athletic participation, revealing the arbitrary nature of the Four-Seasons Rule.

Further undermining the purported academic-progress justification, NCAA rules allow athletes to take a year within the five-year window without competing,

---

[13] *Staying on Track to Graduate*, NCAA, February 10, 2021, https://www.ncaa.org/sports/2021/2/10/student-athletes-current-staying-track-graduate.aspx.

[14] Saquandra Heath, *DI Graduation Rates Remain at Highest Level*, NCAA, Nov. 20, 2024, https://www.ncaa.org/news/2024/11/20/media-center-di-graduation-rates-remain-at-highest-level.aspx.

and this non-competition year can be taken at any time. Under NCAA rules, an athlete can play two years, leave school entirely, and then return for two more years of competition.[15] This directly contradicts any claim that the Four-Seasons Rule is necessary to ensure academic progress.

The Four-Seasons Rule also creates arbitrary and harsh circumstances for students trying to complete the NCAA's purported academic purpose. The rule forces many athletes who have not completed their degrees in four years to make an unnecessary and impossible choice: either remain in school to complete their degree without the ability to earn NIL compensation, athletic scholarships, and other non-NIL benefits in their sport, or abandon their education to pursue professional opportunities that may not be available or sustainable. (Exh. 1: Declaration of Zakai Zeigler at ¶ 22.) This creates a perverse incentive structure that undermines academic progress rather than promoting it.

For athletes like Zeigler who have completed their undergraduate degree requirements, the academic progress justification collapses entirely. These athletes have already fulfilled the NCAA's educational mission by completing their degrees, yet they are still denied the opportunity to compete during their fifth year of eligibility. If the purpose of the rule were truly to promote academic progress, graduated athletes would be exempted from its application.

---

[15] *See Division I 2024-25 Manual, Bylaw 12.8, NCAA,* Aug. 9, 2024, https://www.ncaapublications.com/p-4701-2024-2025-ncaa-division-i-manual.aspx.

In addition, the NCAA's own redshirt rule provides compelling evidence of the arbitrary and anticompetitive nature of the Four-Seasons Rule. (Exh. 2: Declaration of Dr. Joel G. Maxcy at ¶ 29.)

*First*, the redshirt system demonstrates that the NCAA already acknowledges the value of a five-year participation model. (*Id.* at ¶¶ 29-30.) When an athlete redshirts, they typically remain on scholarship, practice with the team, receive coaching and training resources, and even earn NIL compensation—all while preserving a year of competition eligibility. (*Id.* at ¶ 30.) The NCAA permits this arrangement because it recognizes that athletes benefit from development over time and that a five-year model can enhance both athletic and academic outcomes. (*Id.* at ¶¶ 30-31.)

*Second*, the redshirt system reveals the arbitrary nature of the Four-Seasons Rule by creating two classes of athletes with dramatically different rights, despite both existing within the same five-year eligibility window. (*Id.* at ¶ 33.) An athlete who redshirts can compete in years two through five of their eligibility window, while an athlete like Zeigler who competes in years one through four is categorically barred from the market in year five—even though both athletes remain within the NCAA's own defined eligibility period. (*Id.*) This distinction serves no legitimate educational or competitive purpose. (*Id.*)

*Third*, and most tellingly, control over redshirt decisions rests primarily with institutions rather than athletes. (*Id.* at ¶ 31.) Schools strategically "bank" the eligibility of certain athletes they believe will deliver greater, "peak" value in their

fifth year, while requiring immediate participation from others. (*Id.*) As a result, some athletes earn NIL compensation each year of the five-year eligibility window, including the most lucrative fifth year, while others are not offered this opportunity. This represents a unilateral exercise of market power that serves institutional interests rather than athlete welfare. (*Id.*) And there is no legitimate procompetitive justification.

*Fourth*, the existence of the redshirt rule directly contradicts the NCAA's claimed justifications for the Four-Seasons Rule. (*Id.* at ¶ 34.) The Rule cannot be about preserving amateurism, as both redshirted and non-redshirted athletes exist within the same eligibility window and can receive the same educational benefits and NIL compensation. (*Id.*) It cannot be about academic progress, as the redshirt system encourages athletes to extend their athletic participation graduation path to a fifth year regardless of their academic status, while the Four-Seasons Rule bars participation even for athletes like Zeigler who have successfully completed their undergraduate degrees. (*Id.*) Finally, it cannot be about competitive balance, as schools with greater resources can afford more strategic redshirting, creating competitive advantages rather than leveling the playing field. (*Id.*)

Instead, the redshirt system reveals that the Four-Seasons Rule functions primarily as a market control mechanism that allows institutions to strategically manipulate the eligibility window to their advantage. (*Id.* at ¶ 35.) Schools can extract maximum value from athletes while denying those same athletes the opportunity to realize their own market value when it peaks in the fifth year of

eligibility. (*Id.*) There is no procompetitive justification for this system in favor or granting all athletes the ability to play and earn NIL compensation during the fifth year of the eligibility window.

For Zeigler, who has competed for four years and graduated on schedule, this means being barred from the market precisely when his value has reached its apex in the five-year eligibility window. (*Id.* at ¶ 36; Exh. 3: Declaration of James Clawson at ¶¶ 21-22). Had he been redshirted, he would be permitted to compete and earn NIL compensation in the upcoming 2025-2026 season. The Four-Seasons Rule simply has no relationship to the NCAA's educational mission or any legitimate procompetitive purpose. Exh. 2: Dr. Joel G. Maxcy at ¶¶ 34-35).

Moreover, the NCAA has established numerous exceptions to the Four-Seasons Rule, further undermining any claim that strict adherence to this limitation is necessary. COVID waivers, hardship waivers, redshirts, and other exceptions all allow for more than four years of competition under various circumstances.[16] The NCAA even permits former professional athletes to compete collegiately in different sports, as exemplified by J.R. Smith's participation in collegiate golf after his NBA career.[17] These exceptions demonstrate that there is no inherent competitive necessity for a strict four-year limit within the five-year eligibility window.

---

[16] *See Division I 2024-25 Manual, Bylaws 12.8.1.2-12.8.1.7.1.3*, NCAA, Aug. 9, 2024, https://www.ncaapublications.com/p-4701-2024-2025-ncaa-division-i-manual.aspx.

[17] *Smith Completes His First Two Rounds of Collegiate Golf*, NORTH CAROLINA A&T STATE UNIVERSITY, Oct. 11, 2021, https://ncataggies.com/news/2021/10/11/mens-golf-smith-completes-his-first-two-rounds-of-collegiate-golf.aspx.

Furthermore, the NCAA recognizes the benefit of graduate education for athletes who have exhausted their four years of athletics eligibility. Since 1964, the NCAA has awarded up to 126 scholarships of $10,000 to former athletes who wish to pursue graduate education.[18] Through this program, the NCAA is willing to fund graduate education so long as an athlete's four years of eligibility has been exhausted. The NCAA's unwillingness to allow Zeigler to compete in the fifth year of his eligibility window demonstrates that the Four-Seasons Rule bears no rational relationship to any legitimate procompetitive purpose and serves merely to stifle competition.

Perhaps most tellingly, the NCAA has recently considered amending its bylaws to allow eligibility in the fifth year.[19] This consideration undermines any claim that the current rule serves an essential purpose. The NCAA's own deliberations acknowledge the potential for change without competitive harm, casting doubt on any assertion that the current rule is necessary to achieve procompetitive benefits.

The anticompetitive effects of the Four-Seasons Rule simply cannot be justified by reference to the NCAA's educational mission or competitive needs. The rule's application—particularly to athletes who have completed their undergraduate degree and wish to begin graduate-level work—bears no rational relationship to any legitimate procompetitive purpose.

---

[18] *NCAA Postgraduate Scholarship Program*, NCAA, https://www.ncaa.org/sports/2013/11/21/ncaa-postgraduate-scholarship-program.aspx.

[19] Ross Dellenger, *College Sports Leaders Mulling '5-in-5' Rule to Eliminate Redshirts, Waivers and Other Exemptions,* Yahoo! Sports, Jan. 16, 2025, https://sports.yahoo.com/college-sports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html.

### *Step Three: Less Restrictive Alternatives*

Even if the Court were to find that the Four-Seasons Rule serves some legitimate procompetitive purpose, there is a plainly less restrictive alternative that would achieve the same benefits without the anticompetitive effects. The NCAA could create a graduate eligibility exception that permits an additional year of competition for athletes who have completed their undergraduate degrees in four years.

This alternative would achieve the NCAA's purported interest in maintaining the connection between athletics and education while eliminating the arbitrary and anticompetitive exclusion of graduate athletes from the market. Indeed, by allowing athletes who have successfully completed their undergraduate degrees in four years to continue competing within their five-year eligibility window while pursuing graduate education, this alternative would actually further the NCAA's educational mission more effectively than the current rule, which creates perverse incentives for athletes to delay graduation.

It would impose minimal administrative burden on the NCAA, as the association already verifies graduation status for other purposes. And it would prevent the most egregious application of the Four-Seasons Rule—to students who have already fulfilled the NCAA's educational mission.

B. <u>The Tennessee Trade Practices Act Applies</u>

In addition to his Sherman Act claim, Plaintiff is likely to succeed on his claim under the Tennessee Trade Practices Act ("TTPA"). As amended in 2024, the TTPA now explicitly prohibits "all arrangements, contracts, agreements, trusts, or

31

combinations between persons or corporations designed or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any product or *service* in trade or commerce affecting" Tennessee. Tenn. Code Ann. § 47-25-101 (emphasis added). The TTPA also prohibits all "arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in trade or commerce affecting" Tennessee. Tenn. Code Ann. § 47-25-101.

The Four-Seasons Rule violates the TTPA. The Rule is an arrangement, agreement, and combination between the NCAA and its member institutions. As demonstrated above, it unlawfully lessens full competition in multiple ways. *First*, it artificially reduces the supply of athlete services by approximately 20% by categorically excluding fifth-year athletes from competition, despite their continued presence within the five-year eligibility window. *Second*, it systematically removes the most productive and valuable participants from the market—those with the most experience and highest skill levels—thereby reducing the quality of competition. *Third*, it creates a barrier to entry for a specific class of competitors, fifth-year athletes, who would otherwise be eligible to participate in the market.

The Four-Seasons Rule restricts trade and commerce affecting Tennessee in numerous ways. It affects the economic opportunities available to Zeigler as a Tennessee athlete, including his ability to earn substantial NIL compensation as a Tennessee resident. Therefore, it also reduces the production and sale of merchandise bearing Zeigler's name, image, and likeness within the State of Tennessee.

The Rule impacts the University of Tennessee's ability to field competitive teams by restricting its access to experienced athletes like Zeigler who are still within the NCAA's five-year eligibility window. It reduces the quality of college basketball products available to Tennessee consumers, including broadcast viewership, ticket sales, and merchandise. It also impacts the broader Tennessee economy through reduced economic activity related to college basketball.

For all the reasons explained above, the Four-Seasons Rule functions as a price control mechanism in the market for NCAA athlete services and NIL compensation. It artificially suppresses NIL compensation by systematically removing the highest-valued segment of the market—fifth-year athletes who, due to their experience and established performance records, command the highest NIL valuations. It creates an artificial ceiling on compensation by eliminating competition for the services of fifth-year athletes, thereby preventing market forces from determining the true value of these services. Senior and fifth-year players command substantially higher NIL valuations than their less experienced counterparts. By removing these players from the market, the NCAA effectively reduces and controls the price of athlete services in violation of the TTPA.

There is no question that Tennessee' antitrust statute applies to NCAA rules. Earlier this month, the Tennessee legislature solidified the applicability of Tennessee's antitrust law to the NCAA, its athletes, and their names, images, and likenesses. Senate Bill 536 ("SB 536") explicitly bars NCAA rules that "tend to lessen competition" in collegiate athletics, using language that directly mirrors the TTPA's

prohibition against arrangements that "tend to lessen, full and free competition in trade or commerce."

SB 536 specifically addresses the NCAA and other athletic associations, requiring that they "not establish rules that violate applicable state or federal antitrust law." This provision demonstrates the legislature's unambiguous intent that Tennessee's antitrust laws—including the newly expanded TTPA—apply with full force to NCAA regulations affecting athletes within Tennessee.

SB 536 states that the NCAA shall not "[i]nterfere with, prohibit, restrict, or otherwise adversely affect an intercollegiate athlete's ability to earn compensation … and shall not otherwise impact an intercollegiate athlete's eligibility or full participation in intercollegiate athletic events." Tenn. Code Ann. § 49-7-2803(a)(1) (2025).

When read together with the amended TTPA, SB 536 creates a comprehensive state policy against anticompetitive restrictions in collegiate athletics. The 2024 amendment to the TTPA, followed by the 2025 enactment of SB 536, represents the Tennessee legislature's intent and action that its antitrust laws provide robust protection in the modern collegiate sports marketplace.

The NCAA's Four-Seasons Rule directly contravenes this state policy by artificially restricting competition in the market for athlete services and NIL opportunities. By categorically excluding most fifth-year athletes from competition despite their continued presence within the NCAA's five-year eligibility window, the Four-Seasons Rule "tends to lessen full and free competition" in precisely the type of

service market that the amended TTPA was designed to protect. And there is no pro-competitive reason to bar athletes from playing and earning NIL compensation during the fifth year of the eligibility window. This conclusion is further supported by the NCAA's redshirting system, which allows institutions to pick which athletes will redshirt and be allowed to compete in years two through five of the eligibility window and earn NIL compensation for all five years, including the most lucrative fifth year.

For these reasons, Zeigler is substantially likely to succeed on his TTPA claim. The TTPA, coupled with the specific provisions of SB 536, provides a clear statutory basis for challenging the NCAA's Four-Seasons Rule under Tennessee's antitrust statute.

## II.     Irreparable Harm

Zeigler will suffer irreparable harm without preliminary injunctive relief. The opportunity to participate in collegiate athletics cannot be recovered once lost. Courts have consistently recognized that there is no adequate remedy at law for the loss of one season of eligibility due to a violation of the Sherman Act that has not been remedied during the season. *See, e.g.*, *Fourqurean v. NCAA*, No. 3:25-cv-00068-wmc, 2025 WL 993975, at *8–*9 (W.D. Wis. Feb. 6, 2025).

The irreparable nature of Zeigler's injury is manifold:

*First*, Zeigler faces the loss of substantial NIL opportunities that exist only during his period of eligibility to compete in college athletics. As a successful and established collegiate player, Zeigler stands to earn extraordinary NIL compensation

during the 2025-2026 season. (Exh. 1: Declaration of Zakai Zeigler at ¶ 12.) Zeigler's valuation during the 2025-2026 season is between $2 million and $4 million. (Exh. 3: Declaration of James Clawson at ¶¶ 29-30.) This opportunity is time-sensitive and cannot be recovered once lost. The magnitude of these financial opportunities underscores the severity of the irreparable harm Zeigler faces and distinguishes this case from ordinary eligibility disputes.

*Second*, the NIL market's value for athletes peaks in their final years of eligibility, when their name recognition and performance record are most established. (*Id.* at ¶¶ 13-14.) The Four-Seasons Rule thus terminates Zeigler's market access at precisely the moment when his market value reaches its apex within his five-year eligibility window—an irreparable injury to their economic interests. (*Id.* at ¶ 17.)

*Third*, Zeigler faces the loss of critical professional development opportunities. An additional year of collegiate competition would allow him to further develop his skills, enhance his professional prospects, and build his personal brand at the peak of its marketability. (Exh. 1: Declaration of Zakai Zeigler at ¶¶ 15-16.) These developmental opportunities, once lost, cannot be recovered through monetary damages.

*Fourth*, Zeigler will lose the unique opportunity to pursue graduate education while continuing to compete at the highest levels of collegiate basketball—a one-time opportunity that cannot be replicated later in life. (*Id.* at ¶ 14.)

Finally, the window for Zeigler to secure a roster spot for the 2025-2026 season is rapidly closing. Teams, including the University of Tennessee, are currently

finalizing their rosters for the upcoming season, and without immediate relief from this Court, Zeigler will lose the opportunity to participate in the upcoming season. (Exh. 3: Declaration of James Clawson at ¶ 27.) This timing constraint renders the need for injunctive relief particularly urgent.

## III. Balance of Equities

The balance of equities tilts decidedly in Zeigler's favor. He faces the loss of an irreplaceable year of eligibility and the accompanying NIL compensation, professional development, and personal growth opportunities. By contrast, the NCAA would face minimal harm from allowing an exception for athletes who have already fulfilled the association's educational mission.

There would be no harm to other athletes or to competitive balance from allowing Zeigler to compete for an additional season. The NCAA has already established numerous precedents for eligibility extensions, most notably the COVID-19 waivers that permitted athletes from multiple graduating classes to compete for more than four seasons.[20] The narrow exception sought by Zeigler would similarly have no negative impact on the broader landscape of collegiate athletics.

The NCAA's consideration of changing its rules to allow five years of competition further undermines any claim of harm to its interests. If the NCAA itself is contemplating this change, granting relief to Zeigler would merely implement a policy that the NCAA may soon adopt voluntarily.[21]

---

[20] *See Division I 2024-25 Manual, Bylaws 12.8.1.2-12.8.1.7.1.3*, NCAA, Aug. 9, 2024, https://www.ncaapublications.com/p-4701-2024-2025-ncaa-division-i-manual.aspx.

## IV. Public Interest

Granting a preliminary injunction would serve the public interest by promoting educational achievement, aligning NCAA rules with the association's stated educational mission, and enhancing the quality of collegiate athletics as a product.

By rewarding rather than penalizing academic achievement, an injunction would create appropriate incentives for athletes to prioritize their education. This alignment between academic and athletic incentives would further the public interest in ensuring that collegiate athletics serves its ostensible educational purpose.

Moreover, an injunction would promote competition in the market for athlete services, consistent with the fundamental purpose of the antitrust laws to protect the public from the failure of the market. *See Microsoft Corp.*, 253 F.3d at 58. By removing an arbitrary and anticompetitive restraint, an injunction would enhance market efficiency and consumer welfare.

The public also benefits from watching the highest quality of competition possible. More experienced players, like Zeigler, enhance the quality of college basketball as a product. (Exh. 4: Declaration of Dr. Paul Sabin at ¶¶ 12-15.) By allowing these highly skilled athletes to continue competing, an injunction would improve the overall quality of collegiate basketball to the benefit of the consuming public.

---

[21] Ross Dellenger, *College Sports Leaders Mulling '5-in-5' Rule to Eliminate Redshirts, Waivers and Other Exemptions,* Yahoo! Sports, Jan. 16, 2025, https://sports.yahoo.com/college-sports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html.

The public interest would be served by an injunction that enhances the quality of collegiate basketball as a product, promotes educational achievement, and aligns athletic eligibility with the NCAA's stated educational mission. By allowing Zeigler to compete during the 2025-2026 season while pursuing his graduate degree, the Court would benefit the public by ensuring that the highest quality of competition is available to consumers and that academic success is rewarded rather than penalized.

## CONCLUSION

For the foregoing reasons, Zeigler respectfully requests that this Court enter a preliminary injunction enjoining Defendant from enforcing the Four-Seasons Rule against him and permitting him to compete during the 2025-2026 basketball season while pursuing his graduate degree. Zeigler requests that this Court also enjoin Defendant from enforcing Bylaw 12.11.4.2 against him, the University of Tennessee, or any other member institution for actions taken under any preliminary injunction this Court may grant. This protection is necessary because Bylaw 12.11.4.2 would otherwise allow the NCAA to later punish athletes and institutions acting in good faith compliance with this Court's order, if the injunction is later reversed.

Respectfully submitted,

*/s/ Zachary C. Lawson*
Zachary C. Lawson (TN BPR #36092)
J. Alex Little (TN BPR #29858)
LITSON PLLC
111 East Jackson Ave, Suite 203
Knoxville, TN 37915
Telephone: 615-985-8205
zack@litson.co | alex@litson.co

/s/ *Marcos M. Garza*
Marcos M. Garza (TN BPR #21483)
Brent Morris (TN BPR #24621)
Anderson Cofer (*Pro Hac* Pending)
GARZA LAW FIRM, PLLC
550 W. Main Street, Suite 340
Knoxville, Tennessee 37902
Telephone: 865-540-8300
Mgarza@garzalaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of June, 2025, a true and correct copy of the foregoing has been served via the Court's CM/ECF system upon all counsel of record.

/s/ *Zachary C. Lawson*