UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| ZAKAI ZEIGLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 3:25-cv-226-KAC-JEM |
| | ) |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This case is before the Court on Plaintiff Zakai Zeigler's "Motion for Preliminary Injunction" [Doc. 3]. For the below reasons, the Court denies the Motion.

**I.    Background And Findings Of Fact**

Plaintiff "enrolled at the University of Tennessee in 2021 and played four consecutive seasons of NCAA Division I men's basketball" [Doc. 3-1 at 2-3 (Declaration of Zakai Zeigler ("Zeigler Decl.") ¶ 4)]. He "completed [his] undergraduate degree in four years" [*Id.* at 4 (Zeigler Decl. ¶ 12)]. Plaintiff intends to enroll in a graduate degree program "beginning in the fall of 2025" and desires to "compete in one final season of college basketball" while studying [*Id.* (Zeigler Decl. ¶ 14)]. Plaintiff "received substantial financial compensation through" name, image, and likeness (NIL) "agreements in [his] college basketball career" [*Id.* at 5 (Zeigler Decl. ¶ 17)]. And he believes a fifth year of competition would further permit him to "receive significant [NIL] compensation" [*Id.* (Zeigler Decl. ¶ 16)]. The record supports that belief [*See* Doc. 3-3 at 7 (Declaration of James Clawson ("Clawson Decl.") ¶ 21)].

NCAA Bylaw 12.8, known as the Four-Seasons Rule, "limits all student-athletes to four seasons of competition within a five-year eligibility period, regardless of whether they have

completed their undergraduate education or remain academically eligible" [Doc. 3-1 at 2 (Zeigler Decl. ¶ 2)]. The "annual number of NCAA Division I basketball roster slots" for each team are limited and "fixed" [*See* Doc. 27-3 at 15 (Declaration of Matthew Backus) ("Backus Decl.") ¶ 35)]. Because Plaintiff has already played four seasons of Division I basketball at the University of Tennessee, the Four-Seasons Rule would bar him from competing in the 2025-2026 season [*See* Doc. 3-1 at 4 (Zeigler Decl. ¶ 12)].

On May 20, 2025, Plaintiff filed an unverified complaint[1] against Defendant National Collegiate Athletic Association [*See* Doc. 1]. Plaintiff alleges that the Four-Seasons Rule violates the (1) Sherman Act, 15 U.S.C. § 1; and (2) Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 (TTPA), [*Id.* ¶¶ 1, 94-117]. Under Plaintiff's theory, NCAA's Four-Seasons Rule prevents him from playing a fifth year of Division I basketball, and without a spot on a Division I roster, Plaintiff loses significant NIL compensation [*See id.* ¶ 1]. He and those like him are replaced by less "experienced" and lower paid players [*See id.* ¶ 4]. Thus, the theory goes, the Four-Seasons Rule is an unlawful restraint on trade [*See id.*].

Plaintiff filed the instant "Motion for Preliminary Injunction" [Doc. 3] too, asking the Court to preliminarily enjoin enforcement of the Four-Seasons Rule [Doc. 3 at 1-2].[2] Following Defendant's appearance and fulsome expedited briefing, the Court held a hearing on the Motion [*See* Docs. 4, 23, 27, 30].

---

[1] A party must present evidence "that goes beyond the unverified allegations of the pleadings" to "support or oppose a motion for a preliminary injunction." *See* Charles Wright and Arthur Miller, *Fed. Prac. & Proc.* § 2949 (3d ed. 2025).

[2] "[F]or the injunctive relief sought" by Plaintiff to "be effective," he also asks the Court to enjoin Defendant from enforcing Bylaw 12.11.4.2 on behalf of any NCAA member institution that would allow him to play [*Id.* at 2]. Because Plaintiff has not shown an entitlement to injunctive relief, it is not necessary, or appropriate, to enjoin Bylaw 12.11.4.2 to provide full relief to Plaintiff.

2

That hearing was productive. Consistent with the allegations in his Complaint, Plaintiff confirmed that the relevant market for analysis is "the market for student-athlete services and NIL compensation in NCAA Division I basketball" [*See* Docs. 34; 1 ¶ 97]. But Dr. Joel G. Maxcy, Plaintiff's proposed economic expert, did not analyze that market [*See* Doc. 3-2 at 4 (Declaration of Joel G. Maxcy ("Maxcy Decl.") ¶ 14)]. Instead, Dr. Maxcy identified and analyzed "the labor market for athlete services in NCAA Division I men's basketball" [*Id.*]. He did not specifically study NIL compensation—the other side of the economic equation—while conducting his analysis [*See id.*]. Plaintiff conceded as much at the hearing [*See* Doc. 34].

Further, Plaintiff acknowledged that "the current state of the law" was that independent third-party NIL collectives and individual brands control NIL compensation to NCAA Division I basketball players—which players get paid and how much they get paid—not Defendant [*Id.*; *accord* Doc. 27-3 at 18 (Backus Decl. ¶ 41) ("The NCAA does not determine compensation for individual athletes.")]. Plaintiff admitted that NIL collectives could even provide former players, like himself, NIL compensation [*See* Doc. 34]. Plaintiff speculated that NCAA member institutions "are beginning to" pay athletes directly,[3] but he admitted that evidence of any such payments and analysis of any such payments' effects on the market are not in the record [*Id.*].

After the hearing, Plaintiff supplemented the record with additional declarations [*See* Doc. 36]. And the Parties provided supplemental briefing [*See* Docs. 37, 38, 39].

---

[3] The Court takes judicial notice that the Northern District of California approved the *House* settlement on June 6 after the hearing [*See* 4:20-cv-3919, Doc. 979 (N.D. Cal. June 6, 2025)]. *See* Fed. R. Evid. 201. But Plaintiff does not base his preliminary injunction request on the economics that may come to pass if NCAA member institutions implement the *House* settlement. So, approval of the *House* settlement does not change this Court's analysis.

3

**II.     Analysis**

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). A plaintiff seeking a preliminary injunction must meet an exacting standard. The Court considers "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *See Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365-66 (6th Cir. 2022) (quotation omitted) (en banc) (per curiam). "While no single factor necessarily is dispositive, the first—the likelihood of success—in many instances will be the determinative factor." *Dahl v. Bd. of Tr.*, 15 F.4th 728, 730 (6th Cir. 2021) (citations omitted).

A plaintiff is "not required to prove his case in full" at the preliminary injunction stage. *See Certified Restoration Dry Cleaning Network, LLC, v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Even so, Plaintiff must make a "clear showing" that he is likely to succeed on the merits of his claims. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024); *see also Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation omitted). Plaintiff has not done so.

**A. Plaintiff Fails To Demonstrate A Likelihood Of Success On The Merits Of His Sherman Act Claim.**

**i.    The Four-Seasons Rule Is Commercial.**

The Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations," is illegal. 15 U.S.C. § 1. Despite the text of the Act, the Supreme Court has long held that the Act prohibits only "unreasonable" restraints on trade. *See Standard Oil Co. v. United*

4

*States*, 221 U.S. 1, 51 (1911); *see also United States v. Columbia Steel Co.*, 334 U.S. 495, 522 n.19 (1948) (citation omitted). To fall within the ambit of the Act, a challenged rule must be "commercial in nature." *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 432 (2008) (citing *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004)). The United States Court of Appeals for the Sixth Circuit has described the requirement broadly. "There must be a commercial activity implicated." *Id.* at 433. The Court considers "whether the rule itself is commercial, not whether the entity promulgating the rule is commercial." *See id.* (quoting *Worldwide Basketball*, 388 F.3d at 959). The Sixth Circuit "has not yet addressed" whether the Four-Seasons Rule is commercial, but precedent suggests that the Court ought to consider the Rule itself and any "commercial impact" of the Rule. *See Worldwide Basketball*, 388 F.3d at 958-59.

Here, the Four-Seasons Rule is "commercial" because it implicates "commercial activity," *see Bassett*, 528 F.3d at 433, and has "some commercial impact," *see Worldwide Basketball*, 388 F.3d at 959. Post-*National Collegiate Athletic Association v. Alston*, Division I basketball players may receive compensation in exchange for their athletic services. *See* 594 U.S. 69, 100 (2021). The record shows that the nature and amount of that compensation here depends, at least in part, on a relevant player's participation in Division I basketball [*See* Docs. 3-3 at 3 (Clawson Decl. ¶¶ 8-10); 27-3 at 17-18 (Backus Decl. ¶¶ 39-40); 36-3 at 2-3 (Supplemental Declaration of James Clawson ¶¶ 2-3)]. Thus, the Four-Seasons Rule, which places limits on participation in Division I basketball, at least implicates commercial activity and has some commercial impact. The Sherman Act therefore applies.

Defendant resists that conclusion, relying on *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008); but Defendant overreaches by overreading and selectively quoting [*See* Doc. 27 at 10-12]. *Bassett* ultimately concerned a plaintiff's failure to include in his complaint "any allegation [of]

5

the commercial nature of NCAA's enforcement of the rules" at issue. *See Bassett*, 528 F.3d at 433. *Bassett* did not hold, as Defendant asserts, that *"NCAA '**eligibility rules** . . . **are all explicitly non-commercial**'"* [*See* Doc. 27 at 10 (quoting (selectively) *Bassett*, 528 F.3d at 433) (ellipsis in original)]. Instead, *Bassett* said: "[s]imilar to the eligibility rules in *Smith* [*v. NCAA*, 139 F.3d 180 (3d Cir. 1998)], NCAA's rules on recruiting student athletes, ***specifically*** those rules prohibiting improper inducements and academic fraud, are all explicitly non-commercial." 528 F.3d at 433 (emphasis added). *Bassett* merely compared the recruiting rules at issue to other particular "eligibility rules" that another court held were noncommercial. *Bassett* sweeps no broader.

      **ii.**    **The Rule Of Reason Applies Here.**

But what test applies? Defendant initially argued that the Court could uphold the Four-Seasons Rule "upon a quick look" [*See* Doc. 27 at 9]. At the hearing, however, Defendant all but abandoned that argument [*See* Doc. 34]. This aligns with older precedent indicating that courts traditionally apply "the rule of reason to eligibility rules and frequently conclude[] that such rules do not violate antitrust law." *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003) ("*NHLPA I*") (citations omitted) (discussing *Nat'l Collegiate Athletic Assoc. v. Bd. of Regents of Univ of Okla.*, 468 U.S. 85, 98 (1984)). That remains true today at least with respect to application of the Rule of Reason. Because more than a "quick look" is necessary to assess the market factors and impacts here, the Rule of Reason applies. *See Alston*, 594 U.S. at 90-91.

      **iii.**   **Plaintiff Fails To Show A Likelihood Of Success At Step One Of The Rule Of Reason.**

Under the Rule of Reason, a plaintiff bears "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *See Ohio v. Am. Exp. Co.*, 585 U.S. 529, 541 (2018) (citations omitted). This is "no slight

burden." *Alston*, 594 U.S. at 97. The Rule of Reason requires a court to conduct a "fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Am. Exp. Co.*, 585 U.S. at 541 (cleaned up); *see also Alston*, 594 U.S. at 81.

Here, Plaintiff has failed to present sufficient evidence that the Four-Seasons Rule produces substantial anticompetitive effects in the market for student-athlete services and NIL compensation in Division I basketball. In assessing the potential anticompetitive effects of the Four-Seasons Rule on the relevant market, Dr. Maxcy reached his conclusions by analyzing only "the labor market for athlete services in NCAA Division I men's basketball" [*See* Doc. 3-2 at 5 (Maxcy Decl. ¶ 14)]. He analyzed the market "from *Alston*," where the Supreme Court concluded that Defendant "enjoy[ed] monopsony power" over direct school-to-player benefits [*See id.* at 6 (Maxcy Decl. ¶ 16) (citing *Alston*, 594 U.S. at 90)]. But the current market realities are fundamentally different. As *Alston* confirmed, "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis." 594 U.S. at 93 (citations omitted).

The market realities and legal analysis here are materially different. Unlike in *Alston*, Defendant currently does not control the NIL compensation that NCAA Division I basketball players receive [*See* Doc. 34]. "The NCAA does not determine compensation for individual athletes" [Doc. 27-3 at 18 (Backus Decl. ¶ 41)]. Thus, while the Four-Seasons Rule may control who is eligible to play Division I basketball, limiting the labor side of the market, Defendant does not control who receives NIL compensation, the wage side of the market [*See id.*]. More simply, Plaintiff has not shown that Defendant "enjoys the power to set [NIL] wages in the market for student-athletes' labor" such that Defendant's Four-Seasons Rule "produce[s] significant anticompetitive effects" under Plaintiff's theory. *See Alston*, 594 U.S. at 97-98 (citation omitted); *see also Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462,

7

474-75 (6th Cir. 2005) ("*NHLPA II*"). Without more, Plaintiff has not shown that Defendant's limit on the labor side of the market—replacing one Division I basketball player with another—produces substantial anticompetitive effects [*See id.* at 19-22 (Backus Decl. ¶¶ 42-47) (demonstrating that limiting labor—who can play—may increase wages—NIL compensation—and that increasing labor may actually decrease wages). And Plaintiff provided no other basis for the Court to conduct the required "fact-specific assessment of market power and market structure to assess" the Four-Seasons Rule's "actual effect on competition" marketwide. *See Am. Exp. Co.*, 585 U.S. at 541 (cleaned up).

Plaintiff argues that NIL compensation is "inextricably intertwined" with the Four-Seasons Rule [*See* Doc. 34]. That may be true to the extent that third-party NIL collectives and individual brands make independent decisions to pay compensation (wages) only to those players who are playing Division I basketball. But that is not enough to show that Defendant is liable under the Sherman Act. The Sixth Circuit "has not articulated a standard for determining when an injury to competition can be said to have been caused by an alleged restraint on trade." *NHLPA II*, 419 F.3d at 474. And there are no "cases addressing the issue of whether a defendant is subject to antitrust liability" for an action that merely results in "secondary" anticompetitive "effects." *Id.* Thus, to the extent that there are secondary anticompetitive effects of the Four-Seasons Rule brought on by independent actors in the market, Plaintiff has presented no basis for holding Defendant liable. Plaintiff has therefore not made the requisite "clear showing" that he is likely to succeed on his Sherman Act claim. *See, e.g.*, *Starbucks Corp.*, 602 U.S. at 345.

### B. Plaintiff Fails To Demonstrate A Likelihood Of Success On The Merits Of His TTPA Claim.

Plaintiff's argument that he is likely to prevail on his TTA claim fails for at least two reasons. ***First***, under the TTPA, courts must examine whether the alleged restraint in trade "tends

8

to" "work an undue or unreasonable restraint upon full and free competition." *Baird v. Smith*, 161 S.W. 492, 493 (Tenn. 1913). As the Parties agree, this inquiry "mirror[s]" Step One of the Rule of Reason [*See* Docs. 37 at 5 (citation omitted), 27 at 37 (citation omitted)]. *Accord Medison Am., Inc. v. Preferred Med. Sys., LLC*, 357 F. App'x 656, 662 (6th Cir. 2009) (quoting *Freeman Indus., LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 523 (Tenn.2005)). As analyzed above, Plaintiff failed to make the required showing.

***Second***, Plaintiff argues that Tennessee Senate Bill 536, codified in Tennessee Code Annotated § 49-7-2801, *et seq.*, augmented Tennessee antitrust law and rendered all of Defendant's eligibility rules illegal in Tennessee [*See* Doc. 37 at 6; *see also* Doc. 34]. Whatever the merits of that argument, Plaintiff would not be able to obtain injunctive relief under the statute. It "does not authorize, create, or afford any private cause of action, liability, or basis for injunctive or equitable relief." Tenn. Code Ann. § 49-7-2803(b). Instead, the law leaves enforcement in the capable hands of Tennessee's "attorney general and reporter." *Id.* § 49-7-2803(a)(4). Plaintiff therefore may not obtain a preliminary injunction based on a novel interpretation of the law. So, he has not demonstrated that he is likely to succeed on the TTPA claim.

### C. Consideration Of The Other Preliminary Injunction Factors Does Not Warrant Relief.

Further, Plaintiff has failed to show that the remaining preliminary injunction factors support an injunction. Plaintiff's asserted harms, including loss of substantial NIL opportunities and access to the NIL market, are more monetary in nature, and a future money damages award might adequately redress them [*See* Docs. 4 at 35-36; 30 at 29-30; 34]. Additionally, given the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college

9

recruitment disrupted [*See* Doc. 27-3 at 15 (Backus Decl. ¶ 35)]. And Plaintiff failed to produce sufficient evidence showing that granting an injunction would serve the public interest.

**III.     Conclusion**

This Court is a court of law, not policy. What the NCAA ***should do*** as a policy matter to benefit student athletes is beyond the reach of the Sherman Act and TTPA and by extension, this Court. For the above reasons, the Court **DENIES** Plaintiff Zakai Zeigler's "Motion for Preliminary Injunction" [Doc. 3].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge